**CITY OF DETROIT et al., Plaintiffs-Appellees,**

v.

**GRINNELL CORPORATION et al., Defendants-Appellees.**

**MANHATTAN–WARD, INCORPORATED, et al., Plaintiffs-Appellees,**

v.

**GRINNELL CORPORATION et al., Defendants-Appellees.**

**1225 VINE STREET BUILDING, INC., et al., Plaintiffs-Appellees,**

v.

**GRINNELL CORPORATION et al., Defendants-Appellees.**

**Nos. 14, 18, Dockets 73–1211, 73–1420.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1973.

Decided March 13, 1974.

Harvey S. Kronfeld, Philadelphia (Mesirov, Gelman, Jaffe & Levin and Anthony E. Creato, Philadelphia, Pa., of counsel), for appellants Aldon Industries, Incorporated and 19 other objectors.

William Simon, Washington, D.C. (Howrey, Simon, Baker & Murchison and G. Joseph King, Washington, D.C., of counsel), for appellants Bay Fair Shopping Center, and others, claimants.

David Berger, Philadelphia, Pa. (David Berger, P.A. and H. Laddie Montague, Jr., Philadelphia, Pa., of counsel), for appellees City of Detroit, Manhattan-Ward, Inc., 1225 Vine Street Building, Inc., Class Representatives.

Gordon B. Spivak, New York City (Lord, Day & Lord, Herbert Brownell, Thomas D. Brislen, New York City, David Berger, P.A., Philadelphia, Pa., David Berger, and H. Laddie Montague, Jr., Philadelphia, Pa., of counsel), for appellees David Berger and David Berger, P.A., Counsel for Class Representatives.

Denis McInerney, New York City (Cahill, Gordon & Reindel, Thomas Curnin and Allen S. Joslyn, New York City, of counsel), for appellee Grinnell Corp.; (White & Case, MacDonald Flinn, Thomas McGanney, Mario Diaz-Cruz III, New York City, of counsel), for appellee American District Telegraph Company; (Kelley, Drye, Warren, Clark, Carr & Ellis and Bud G. Holman, New York City of counsel), for appellee Holmes Electric Protective Company; (Olwine, Connelly, Chase, O'Donnell & Weyher, William F. Sondericker, and Joseph M. Burke, New York City, of counsel), for appellee Automatic Fire Alarm Co.

Barry Brett, New York City (Parker, Chapin & Flattau, Alvin M. Stein, Weil, Gotshal & Manges, A. Paul Victor, Freda F. Bein, Liebman, Eulau, Robinson & Perlman, Herbert Robinson, New York City, of counsel), for appellees pro se.

Before MOORE and HAYS, Circuit Judges, and BRYAN, District Judge.*

MOORE, Circuit Judge:

This is an appeal from the District Court's approval of a proposed settlement, pursuant to Rule 23 of the Federal Rules of Civil Procedure, of three consolidated private antitrust national class actions brought in October, 1968, by commercial, industrial and governmental subscribers of "central station protection services" against four defendant corporations to recover treble damages plus attorneys' fees and costs under Section 4 of the Clayton Act. 15 U.S.C. § 15 (1970). The approved settlement, filed on December 27, 1972, calls for payment by the four defendants of $10 million to the three classes of plaintiffs and, in addition, grants a fee award of $1.5 million to counsel for the class representatives. The District Court retained jurisdiction over the case for the purposes of determining whether four other petitioning firms were entitled to share in this fee. The first group of appellants, consisting of members of the represented classes, attacks the settlement on the ground that it is so small as to be grossly unfair on its face. They also object to the manner in which the District Court approved the settlement. A second group of appellants, also members of the represented classes, seeks to overturn the fee award and to prohibit any outside attorneys from sharing in whatever award might ultimately be made.

Although all considerations point to the fact that the $10 million dollar settlement is fair and equitable, those same considerations do not justify such a large counsel fee award. Consequently, we affirm the District Court's approval of the settlement and reverse and remand for a hearing as to the fee award. We do not yet have the jurisdiction necessary to decide whether anyone other than counsel for the class representatives ought to share in any fee which might ultimately be awarded.

THE FACTS

Defendants American District Telegraph Company (ADT), Grinnell Corporation (Grinnell), Holmes Electric Protective Company (Holmes) and Automatic Fire Alarm Company (AFA) are in the business of providing "central station protection services" against the hazards of loss by burglary or fire. Alarm systems are installed on the premises of their customers, and protection services are furnished under subscriber contracts. "Central stations" are maintained in various cities throughout the country where the alarm devices on the protected premises are monitored.

The class actions in issue developed out of a civil injunctive action brought by the United States against the defendants. On November 27, 1964, Judge Wyzanski filed an opinion finding violations of Sections 1 and 2 of the Sherman Act. United States v. Grinnell Corporation, 236 F.Supp. 244 (D.R.I.1964). On June 13, 1966, the Supreme Court, in a six-to-three decision, affirmed the Dis-

* Of the Southern District of New York, sitting by designation.

trict Court in part, reversed in part, and remanded for further hearings on relief. United States v. Grinnell Corporation, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). After more than a year of extensive further documentation, depositions, negotiations and hearings, Judge Wyzanski entered a final decree on July 11, 1967. Aside from awarding generalized injunctive relief, including a prohibition against predatory pricing "at unreasonably low charges," the final decree directed varying amounts of divestiture of the assets by American District Telegraph Company in twenty-one of the one hundred and fifteen cities served by ADT, and directed other relief relating to the offering of contracts by ADT to competitors in five cities.

Thereafter two treble damage actions were brought in the United States District Court for the Eastern District of Pennsylvania by *competitors* of the defendants, Robinson Electric Protective Corporation v. Grinnell Corporation, Civ. No. 27961 and Sentinel Alarm Corporation v. Grinnell Corporation, Civ. No. 36061. The theory of these cases was that the defendants, beginning in 1958, had attempted to drive them out of business by predatory pricing. After extensive discovery covering pricing practices, the defendants settled the cases prior to trial. A series of suits instituted by both competitors and subscribers of the alarm company defendants followed. Suits were filed by over forty-eight competitors alleging predatory pricing practices in over thirty cities throughout the United States. In addition to the three national class actions *sub judice,* over fifty-four other individual subscriber actions were filed by other counsel.

In July, 1968, these three national class actions were commenced in the United States District Court for the Eastern District of Pennsylvania for all governmental, commercial and industrial subscribers of the defendants. The breadth of these classes is such that the only subscribers not covered are home-owners, federal governmental agencies, and governmental entities in three states [1] which are represented in separate statewide class actions.

On October 3, 1968, the national class actions, along with all but one other pending competitor case, were transferred, pursuant to 28 U.S.C. § 1407, to the United States District Court for the Southern District of New York for consolidation and coordination for pre-trial purposes.

At the time this settlement agreement was executed, on August 27, 1971, the national class actions had been pending for more than three years. Discovery by interrogatories and requests for production of documents had been substantially completed. All preliminary motions were filed, briefed, argued and resolved by judicial decision. As a result of the ruling on defendants' partial summary judgment motion, sub nom. Russ Toggs, Inc. v. Grinnell Corporation, 304 F.Supp. 279 (S.D.N.Y.1969), aff'd 426 F.2d 850 (2d Cir.), cert. denied, 400 U. S. 878, 91 S.Ct. 119, 27 L.Ed.2d 115 (1970), the three national class actions were held to have been timely filed. However, the rulings clearly established that with respect to any unfiled cases, the statute of limitations expired in September, 1968. A determination of the validity of the class action device, earlier stayed until defendants' motion for partial summary judgment had been adjudicated, was briefed and supported by affidavits and a hearing was held before the District Court on June 18, 1971. It was after the class action hearing that settlement negotiations between class counsel and counsel for defendants became serious. As a result, the District Court was asked to withhold any class action determination until after the settlement negotiations had been exhausted. Thereafter, settlement negotiations resulted in the settlement agreement dated August 27, 1971.

The Settlement Agreement on behalf of these three national class actions pro-

1. Connecticut, Maryland and New Jersey.

vided for the creation of a settlement fund in the amount of $10 million payable to the classes over a five year period, with interest. The period for includable transactions on which the allocation of the settlement fund is based is the period from April 13, 1957 (four years prior to the institution of the government case) to July 11, 1968 (the day after the actions were filed and one year after entry of the final decree in the government case). Notice was mailed at defendants' expense to 89,000 of their known customers and was also published for three consecutive weeks in all editions of the *Wall Street Journal* and the *New York Times*. Fourteen thousand one hundred fifty-six claimants filed claims. One hundred eighty-four attorneys and firms filed notices of appearance on behalf of the claimants and were served with defendants' papers in support of the settlement. A number of the plaintiffs in the individual subscriber nonclass actions decided to participate in the settlement as well.

After receiving documents from counsel for class representatives and counsel for defendants in support of the proposed settlement, and all claimants having an opportunity to file objections and papers in support thereof, the District Court held hearings on May 24 and 25, 1972, so that it might rule on the propriety of the settlement agreement, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, and might award fair and adequate attorneys' fees to those who had represented the interests of the classes. On December 27, 1972, the District Court approved the settlement agreement and awarded, out of the settlement fund, $1.5 million plus $14,918.73 out-of-pocket expenses, to counsel for the class representatives, David Berger, Esq. and David Berger, P.A. The Court determined that further hearings would be necessary before it could decide whether other attorneys should share in the fee award.

Under the proposed settlement and the final judgment approving it, the treble damage claims of the classes are dismissed with prejudice.

## THE SETTLEMENT

These appellants, members of the classes which received the $10 million settlement, claim both that the settlement was inequitable on its face and that many of the principles applied by the District Court in approving the settlement were erroneous and mandate reversal. Appellants make four specific contentions. First, they allege that the settlement fund amounts to such a small fraction of the amount which might have been recovered if complete victory had been attained at trial that the law demanded its rejection by the District Court. Second, appellants submit that the District Court committed reversible error when it refused to permit an evidentiary hearing to investigate the propriety of the settlement. Third, they argue that it was error for the District Court to approve of the class action solely for the purpose of settlement while reserving approval of the class action for all other purposes. Finally, appellants urge that the District Court was persuaded in its decision to approve the settlement by considerations, such as the impecuniousness of the defendants and the inconvenience that might be visited upon the Court in the event that the settlement was rejected, which were both irrelevant to the legal issues and improperly entertained. We find no merit in any of these positions.

▉ As we evaluate the settlement approved in this case, this Court must remain mindful that:

> Great weight is accorded his [the trial judge's] views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.

Ace Heating & Plumbing Co., Inc. v. Crane Company, 453 F.2d 30, 34 (3d Cir. 1971).

In fact, so much respect is accorded the opinion of the trial court in these matters that this Court will intervene in a judicially approved settlement of a class action only when the objectors to that settlement have made a clear showing that the District Court has abused its discretion. Newman v. Stein, 464 F.2d 689 (2d Cir. 1972); West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2d Cir.), cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

## I.

■ The first claim set forth by appellants is that the $10 million settlement was inadequate as a matter of law. They allege that the settlement amounts, at most, to only twelve percent of what the District Court found was the potential recovery for the settlement period and that such a proposed settlement is grossly unfair on its face when liability has been *prima facie* established.

■ The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.[2]

■■ The proposed settlement cannot be judged without reference to the strength of plaintiffs' claims. "The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." West Virginia v. Chas. Pfizer & Co., *supra*, 440 F.2d at 1085. *See also* Protective Committee v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1

(1968); Newman v. Stein, *supra*; Upson v. Otis, 155 F.2d 606 (2d Cir. 1946); Percodani v. Riker-Maxson Corporation, *supra* note 2; Norman v. McKee, 290 F.Supp. 29 (N.D.Cal.1968), aff'd 431 F.2d 769 (9th Cir. 1970). If the settlement offer was grossly inadequate, as appellants contend, it can be inadequate only in light of the strength of the case presented by the plaintiffs. Naturally, they describe their offensive posture in glowing terms, sparing no superlatives, while the defendants show a similar lack of restraint in demeaning the value of plaintiffs' cause of action. Nevertheless, the only truly objective measurement of the strength of plaintiffs' case is found by asking: "Was defendants' liability *prima facie* established by the government's successful action?" Whenever such liability has been *prima facie* established, any party wishing to justify a settlement offer that amounted to only a small fraction of the ultimate possible recovery would appear to have a very substantial burden of proof. The instant case, however, does not fall into this category.

■ Section 5(a) of the Clayton Act enables the decree in a successful government action to be used as *prima facie* evidence of the defendant's violation of the law that is *established in that action*. The decree which resulted from the government's *Grinnell* victory, however, has very little to do with the instant class actions. The government's victory was in large part predicated on defendants' predatory *price cutting* practices which, according to the Court, demonstrated the existence of both monopoly power and an intent to destroy competition. These findings are of dubious value to the class plaintiffs in the

---

2. In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery. Any reading of Judge Friendly's opinion in Newman v. Stein, 464 F.2d 689 (2d Cir. 1972), or of the District Court's opinion in Percodani v. Riker-Maxson Corporation, 50 F.R.D. 473 (S.D.N.Y.1970), aff'd sub nom. Farber v. Riker-Maxson Cor-

poration, 442 F.2d 457 (2d Cir. 1971), which seems inconsistent with this principle misreads those opinions.

It might be pointed out that the settlement agreement approved in Sunrise Toyota v. Toyota Motor Company, Ltd., 1973–1 Trade Cases ¶ 74,398, at 93,821 (S.D.N.Y.1973), did not provide for the payment of any money to the class members.

present actions. No questions with respect to any injury to *subscribers* were either put in issue or determined in the government action. In fact the basis for the government decree was probably adverse to the interests of these subscriber-plaintiffs,[3] insofar as these plaintiffs, in order to obtain monetary relief, have to prove that the monopolization resulted in artificially *inflated* prices.

Appellants attempt to rebut these facts by introducing the "O'Brien Memorandum", a document written by the Sales Manager of defendant ADT to his immediate superior, which complains of the high prices which that defendant was charging its subscribers. *See* Appendix Vol. I, at 447G. In addition, they argue that it taxes credulity for defendants to assert that they might conspire against competitors over a prolonged period of time without a desire to benefit financially by overcharging subscribers. Predatory pricing may be a *road* to monopoly power; the *end* of monopoly power may be a hoped-for monopoly profit, an end which can only be finally achieved through illegally *inflated* prices. These arguments represent a shift in ground on the part of appellants. They demonstrate that at its core their case is based not on the decision in the government suit, but rather on the contents of a single document and a logical deduction.

█ Since defendants' liability was not *prima facie* established it becomes necessary to consider the strength of the case presented by the class members in order to determine whether there is any

basis for appellants' claim that the settlement was grossly unfair and inadequate. It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute. It is well settled that in the judicial consideration of proposed settlements, "the [trial] judge does not try out or attempt to decide the merits of the controversy," West Virginia v. Chas. Pfizer & Co., *supra*, 314 F. Supp., at 741, and the appellate court "need not and should not reach any dispositive conclusions on the admittedly unsettled legal issues . . . ." West Virginia v. Chas. Pfizer & Co., *supra*, 440 F.2d, at 1085–1086.

█ The government in its case indeed proved that defendants were guilty of illegal monopolization. This finding, however, is not *prima facie* proof of defendants' liability to their subscribers. Moreover, even the basic question of monopolization, although *prima facie* established, is still open to attack. The determination in the government action does not estop defendants from relitigating the question. *See* Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951). They might well carry the day in any new airing of that issue. Three Justices of the United States Supreme Court dissented to a portion of that Court's opinion because they felt that the government's proof of monopolization was based on an unfair definition of the relevant geographic and product-line markets.[4] In

---

3. Originally, both competitors and subscribers had joined together after the government action in an attempt to coordinate their private actions against the alarm company defendants. Eventually, competitor and subscriber plaintiffs stopped coordinating discovery because the interests of the two groups relating to the proof of impact and damages rested upon diametrically opposed theories.

4. The defendants were found guilty of monopolizing a national market for accredited

central station services. They argue that no matter how their services are defined, they did not compete in a single national market but rather competed in a series of local markets so that, at least for the purposes of evaluating impact, defendants' conduct must be judged in terms of the conditions and activities in each of the areas. Defendants also contend that non-interchangeable services, such as burglar and fire alarms, should not have been lumped together as part of a single market. Moreover, defendants object to the failure to take account of other types

its opinion approving the settlement offer this District Court found these market issues, and consequently the whole monopolization question, very much alive. Detroit v. Grinnell Corp., 356 F. Supp. 1380, 1388 (S.D.N.Y.1972).

Even if the relitigation of the market issues does not succeed in overturning the basic finding of monopolization, it would almost inevitably affect the proof of impact and damages. It appears that the majority of claimants may well be subscribers in "competitive cities", i. e., cities where prices were low and alternative services were open to subscribers. Of the more than 14,000 claims, over 8,800 are apparently from competitive cities, representing approximately sixty-two percent of the total transactions reflected in the claims that have been submitted.

Finally, the record shows that if the proceedings had continued and had not been stopped short by the settlement offer, there would have been a serious question as to whether these actions could have been maintained as class actions at all. In its approval of the settlement offer the District Court outlined some of the factors which militate against the use of the class action device. The separate liability and damage issues present enormous difficulties. There are different competitive climates in each of the locales involved. All the members of a class did not contract for the same services even in the same city. In addition, a substantial administrative burden could have resulted from approval of the class actions urged in this case.

The District Court estimated that, at an absolute minimum, the separate liability and damage issues would take at least five years to try. Such necessitous judicial delays and the resulting uncertainty in outcome were all factors which would weigh strongly in any decision to accept a settlement.

The class action issues were thoroughly briefed, argued and orally presented to the District Court. They were sub judice when the settlement now before this Court was negotiated and reached. If the agreement is overturned, it then will become necessary for the District Court to decide the issue, since defendants reserved their rights to attack the class action anew.

The objectors dispute each of these points vigorously, but the fact remains that their case is not prima facie proven by the government's enforcement action and that several substantial roadblocks stand in the way of any ultimate victory for plaintiffs on the merits. The settlement offer, therefore, is not inadequate as a matter of law and the fact that it consists of one fractional portion of the possible ultimate recovery rather than another is insufficient to indict its legal adequacy at the appellate level.

Even if, for the sake of argument, we assume that the District Court's approval of the settlement offer could be called into question because the settlement amounted to a given fractional portion of the ultimate possible recovery, reversal in this case would remain unwarranted. Appellants' argument would hinge entirely on their parallel asser-

of alarm systems, such as direct collection services, local alarms, telephone answering services, and unaccredited central station protection services, in determining the existence of competition.

The dissenting members of the Supreme Court agree with defendants that the majority's attempt to define the geographic market as "the nation" without any consideration for the variances in competition from city to city and its insistence that the relevant product market was restricted to accredited central station protection services "dramatically demonstrates that its [the majority's] action has been Proscrustean—that

it has tailored the market to dimensions of the defendants" and that this "gerrymandering market definition" resulted in a "strange red-haired, bearded, one-eyed man-with-a-limp classification." United States v. Grinnell, 384 U.S. at 590–591, 86 S.Ct. at 1714 (dissent of Fortas, J.). The New York Times reported that after having read Justice Fortas' opinion, Judge Wyzanski, the trial judge in the government case, stated that "Justice Fortas went to the heart of my error . . . If I had heard him beforehand, I certainly would have rewritten my opinion." The New York Times, May 16, 1969, at 20.

tions that the settlement offer: (1) amounts to a mere twelve percent of the potential recovery as that recovery was computed by the District Court, and (2) in fact amounts to less than twelve percent of the real potential recovery which was grossly underestimated by the District Court. The facts do not bear out either of these claims. Contrary to appellants' assertions, the settlement offer was not twelve percent of the District Court's estimate of ultimate possible recovery; rather, it was fully one hundred percent of the District Court's estimate of potential recovery, an estimate that was correctly deduced.

In analyzing the propriety of the settlement offer before it, the District Court largely accepted the plaintiffs' claim that approximately $330 million worth of defendants' billings to them during the $11\frac{1}{4}$ year damage period were artificially inflated by monopolistic pricing practices. The Court likewise accepted figures supplied by appellants to the effect that from three to seven percent of these billings represented unlawful monopoly profit. This meant that total possible liability for that period was between $9.9 million and $23.1 million. The District Court decided that the $10 million settlement was "well within the ballpark." Detroit v. Grinnell Corp., *supra*, 356 F.Supp. at 1386.

The District Court did not approve a settlement offer that amounted to twelve percent of plaintiffs' potential recovery. Appellants' twelve percent figure is based upon the assumption that potential recovery is not limited to single damages, but rather consists of treble damages. They therefore reach the conclusion, which they inexplicably attribute to the District Court, that ultimate recovery amounts to $69.3 (3 x $23.1) million (they ignore the lower end of the scale which they themselves established). On this basis they calculated that the $10 million settlement offer amounted to only twelve percent [sic] of the $69.3 million potential recovery.

■ Ignoring for the moment their use of only the top portion of the recovery range, we find that their position turns on the question of whether treble damages ought to be used to calculate the potential liability. Appellants argue that trebling is compelled by the punitive provisions of the federal antitrust laws. The only authority which they have submitted on this issue is a recent unreported memorandum opinion of the United States District Court for the Eastern District of Illinois which holds that trebling of the base range is necessary because without it:

> [T]he defendants would retain a substantial portion of any illegal gains rather than be penalized for their violations of the antitrust laws as Congress clearly intended by its provision for treble damages.

Illinois v. J. S. Peterson Coal Co., Civil Action No. 71–C–2548, (E.D.Ill. May 29, 1973).

The Eastern District of Illinois, in turn, cited no authority for its position but rather relied exclusively on the observation that:

> There is nothing in the language or the history of the antitrust laws which suggests that single recovery of the damages sustained by victims of antitrust violations who file claims is the proper measure of their recovery. The provision for treble damages is obviously contrary to such a conclusion.

*Id.*

While it is true that treble damages are extracted from a defendant who ultimately loses a civil antitrust suit on the merits, there are strong reasons why trebling is improper when computing a base recovery figure which will be used to measure the adequacy of a settlement offer. First, the vast majority of courts which have approved settlements in this type of case, even though they may not have explicitly addressed the issue, have given their approval to settlements which are traditionally based on an estimate of single damages only. *See* Halper, The Unsettling Problems of Settlement in Antitrust Damage Cases, 32

ABA Section of Antitrust Law 98 (1966); Alioto, The Economics of a Treble Damage Case, 32 ABA Section of Antitrust Law 87 (1966). Second, to argue that treble damages ought to be considered in a calculation of a base recovery range is to distort the entire theoretical foundation which underlies the settlement process. It requires defendants to admit their guilt for the purpose of settlement negotiations. One of the underlying premises on which such negotiations are based, however, is that defendants never have to concede their guilt. They can protest their innocence of any wrongdoing and assert that they are settling for purely pragmatic business reasons. To require treble damages to be considered as part of the computation of the base liability figure would force defendants automatically to concede guilt at the outset of negotiations. Such a concession would upset the delicate settlement balance by giving too great an advantage to the claimants —an advantage that is not required by the antitrust laws and one which might well hinder the highly favored practice of settlement.

In addition to their claim that the twelve percent recovery was unjust as a matter of law, appellants allege that the District Court substantially underestimated the ultimate recovery figure. They claim that ultimate recovery could well amount to $170 million—almost eight times the maximum recovery calculated by the Court, and more than seventeen times the Court's minimum recovery estimate. There is no foundation for such claims.

■ Appellants first allege that the base recovery figure was substantially understated because it did not include any provision for the claimants' legal expenses.[5] Appellants are not asking that reasonable legal expenses for services actually rendered by their attorneys be added to whatever settlement figure is finally agreed upon. Such a request would fly directly into the face of clear authority which holds that plaintiffs and not defendants are responsible for paying the fees of plaintiffs' attorneys. *See* Philadelphia v. Chas. Pfizer & Co., Inc., 345 F.Supp. 454 (S.D.N.Y.1972); Norman v. McKee, *supra.*

■ Rather, appellants are asserting that the District Court was compelled to inflate its estimate of ultimate possible recovery by adding to it the attorney's fees authorized by Section 4 of the Clayton Act to plaintiffs who are victorious on the merits—a factor which would increase the potential recovery by as much as $10 million.

■ This claim must fail for the same reasons that dispose of appellants' treble damage argument. The provision for recovery of attorneys' fees contained in Section 4 of the Clayton Act is dependent upon recovery of a judgment. Decorative Stone Co. v. Building Trades Council, 23 F.2d 426, 428 (2d Cir.), cert. denied, 277 U.S. 594, 48 S.Ct. 530, 72 L. Ed. 1005 (1928); Alden-Rochelle, Inc. v. American Society of Composers, Authors and Publishers, 80 F.Supp. 888 (S.D.N. Y. 1948). *See also* Trans World Airlines, Inc. v. Hughes, 312 F.Supp. 478, 483 (S.D.N.Y.1970), modified, 449 F.2d 51 (2d Cir. 1971), reversed on other grounds, 405 U.S. 915, 92 S.Ct. 960, 30 L.Ed.2d 785 (1972). Here, plaintiffs have settled in order to avoid the considerable risk that they would not be able to recover at all. There can be no warrant for urging that in such circumstances the court is required to add on the attorneys' fees that would accrue to plaintiffs only if they were successful in litigating these actions. To do so would be tantamount to a judicial assumption that settlement negotiations were predicated on defendants' admission of guilt. Such an assumption is contrary to the

---

5. Appellants judge that legal fees could reasonably amount to ten or fifteen percent of the liability. If liability amounts to $69 million, as it would if treble damages were considered, then reasonable attorneys' fees might amount to as much as $10 million if victory on the merits were ultimately obtained. This would bring the base recovery figure to approximately $80 million.

basic principles which underlie settlements.

The final portion of appellants' attack on the District Court's computations is the most extreme of all. They contend that the 11¼ years from April 13, 1957, to July 11, 1968, were erroneously denominated as the "settlement period." The true settlement period, according to appellants, should have also covered the "tacit conspiracy" era from 1947 to 1953. Once this is done, they calculate that an additional $90 million should have been added to the potential recovery figure,[6] so that the total cumulative ultimate recovery of plaintiffs, assuming complete victory on the merits, would be in the neighborhood of $170 million, of which the $10 million settlement is between five and six percent.

This claim is rooted in the government enforcement action which found that, for the period between 1947 and 1953, defendants Grinnell and Holmes unlawfully conspired to commit anticompetitive acts with defendant ADT while they were unaffiliated companies and ostensible competitors acting under conditions of free and open competition. The lower court considered the possibility of an extension of the settlement period based on this "fraudulent concealment" theory and dismissed it, *inter alia*, because "the relationship between the defendants [as affiliated companies] was public and common knowledge for a long time." Detroit v. Grinnell Corp., *supra*, 356 F.Supp. at 1387.

■ In order to establish fraudulent concealment, a claimant must show: (1) that defendants concealed the basic facts that would reveal the existence of their monopolistic behavior, and (2) that plaintiffs were ignorant of those facts through no fault of their own. *See* Moviecolor Ltd. v. Eastman Kodak Company, 288 F.2d 80, 87 (2d Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed. 2d 26 (1961). *See also* Baker v. F. & F. Investment Company, 420 F.2d 1191 (7th Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970).

■ Because the statute of limitations in private antitrust suits generally cuts off claims that arise more than four years before the inception of the government enforcement action which tolls that statute until one year after the conclusion of such action,[7] plaintiffs would have been required to present their proof of fraudulent concealment to recover any claims for the period before April 13, 1957 (the government's action having been filed on April 13, 1961). Moviecolor Ltd. v. Eastman Kodak Company, *supra*. If such surreptitious anticompetitive behavior could be demonstrated, the statute of limitations could be extended beyond its typical four year reach to the date when the concealment began. Like the institution of the government action, fraudulent concealment tolls the four year statute of limitations.

■ The operation of the "government toll" means that the earliest date to which this suit can be extended is April 13, 1957, four years before the commencement of the government enforcement action which tolls the statute under Section 5(b) of the Clayton Act. 15 U.S.C. § 16(b) (1970). One may tack the government toll on to the one arising from fraudulent concealment only if the acts of fraudulent concealment continued into or beyond the earli-

---

**6.** Total billings during this period amounted to $400 million. Seven percent of that figure is $28 million, which trebled equals $84 million. If a hypothetical attorney's fee of $6 million is added to this amount, the $90 million figure can be obtained.

**7.** (b) Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15(a) of this title, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter . . . .
15 U.S.C. § 16(b) (1970).

est day for which recovery could be sought due to the government toll—in this case, April 13, 1957.

Appellants argue that defendants were engaged in acts of fraudulent concealment between 1947, when defendants Holmes and ADT ostensibly terminated their unlawful written agreement of 1906 which divided business, market areas and customers, and 1953, when the continued affiliation between defendants became public knowledge through extensive newspaper publicity which resulted from Grinnell's acquisition of ADT and the Justice Department's inquiry into that acquisition. However, if the fraudulent concealment ended in 1953, then the cause of action for that period may be deemed to have arisen in that year. The earliest date to which this suit can be extended is April 13, 1957. Obviously, under these conditions, there is an unbridgeable gap between 1953 and 1957 and even if fraudulent concealment occurred during the 1947–53 period, suit on events which occurred at that time would be fruitless.

Appellants correctly point out that when an antitrust cause of action is concealed, the statute of limitations does not begin to run when the concealment ends, but rather when the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice. Tracerlab, Inc. v. Industrial Nucleonics Corp., 313 F.2d 97 (1st Cir. 1963); Crummer Co. v. Du Pont, 255 F.2d 425 (5th Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 119, 3 L.Ed.2d 113 (1958). Once it appears that the statute of limitations has run, the *plaintiff* must sustain the burden of showing not merely that he failed to discover his cause of action prior to the running of the statute of limitations, but also that he exercised due diligence and that some affirmative act of fraudulent concealment frustrated discovery notwithstanding such diligence. Laundry Equipment Sales Corp. v. Borg-Warner Corp., 334 F.2d 788 (7th Cir. 1964); Moviecolor Ltd. v. Eastman Kodak Co., *supra*; Starview Outdoor Theatre, Inc. v. Paramount Film Distributing Corp., 254 F.Supp. 855 (N.D. Ill.1966). *See also* Dawson, Undiscovered Fraud and Statutes of Limitation, 31 Mich.L.Rev. 591 (1933); Dawson, Fraudulent Concealment and Statutes of Limitations, 31 Mich.L.Rev. 875 (1933). Appellants have not even attempted to make such a showing. Their sole complaint is that appellees have not proven that each of the claimants had actual or constructive knowledge of the fraudulent concealment. However, the burden of proof is upon appellants and not upon appellees. Needless to say, they have neither carried nor attempted to carry this burden. In their reply brief, appellants reverse their field and argue that the fraudulent concealment may well have continued after 1953. They exclaim with some indignation that "there is not an iota of evidence and none is cited by defendants to support *their* bold assertion that the 'concealment ended' in 1953." Appellants' Reply Brief, at 8. (Emphasis supplied). This indignation is ironic in light of the fact that the consignment of the fraudulent concealment to the 1947–53 period was originally the work of the appellants and was simply assumed to be correct by the appellees for the sake of argument. Once again, appellants appear to be shifting to and fro in an attempt to conceal the flaws in their position. Since no appellant has ever tendered any proof to the effect that fraudulent concealment persisted after 1953, that issue must be considered as settled in favor of appellees.

The conclusion is inescapable that the base liability figure against which the District Court measured the settlement offer was in all respects an adequate and fair figure.

Appellants can muster no other arguments to support their contention that the settlement offer was legally inadequate. We, therefore, hold that the Dis-

trict Court's approval was justified and proper.

Any claim by appellants that the settlement offer is grossly and unreasonably inadequate is belied by the fact that, from all appearances, the vast preponderance of the class members willingly approved the offer. Only twenty objectors appeared from the group of 14,156 claimants. The total billings of the objectors consisted of approximately $270,000 during the settlement period or approximately one half of one percent of the billings of all claimants. One hundred and fifty attorneys entered appearances for class members who filed claims; only five of these attorneys objected to the settlement in the court below; only one law firm pursued its objection to this Court. General approval of the terms of the settlement is further indicated by the fact that a number of plaintiffs in the individual subscriber non-class actions have decided to participate in it. Plaintiffs in only thirty-nine of the eighty-four individual cases have decided not to participate and their cases remain pending.

The favorable reception of the settlement offer at the hands of both plaintiffs and the individual attorneys who had little or nothing to do with the negotiation of the settlement is strong evidence that the District Court not only failed to abuse its discretion in approving the settlement but fulfilled its obligation in exemplary fashion.

## II.

Appellants next argue that irrespective of the adequacy of the settlement offer, the District Court erred when it refused to permit an additional evidentiary hearing on the propriety of the settlement. They ask, at the very least, that this Court reverse and remand the cases with instructions to the lower court to afford them the opportunity to develop, through discovery, facts which might be germane to the propriety of the settlement.

The rule in this Circuit provides that an approval of a class action settlement offer by a lower court must be overturned if that court acted "without [knowledge of] sufficient facts concerning the claim" or if it "failed to allow objectors to develop on the record facts going to the propriety of the settlement." Newman v. Stein, *supra*, 464 F.2d at 692. Yet this directive must be read with the perspective provided by Young v. Katz, 447 F.2d 431 (5th Cir. 1971) which held that:

> It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the court try the case which is before it for settlement . . . . Such procedure would emasculate the very purpose for which settlements are made. The court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable [citing Neuwirth v. Allen, 338 F.2d 2 (2d Cir. 1964)].

447 F.2d at 433.

*See also* In re Riggi Brothers Co., 42 F.2d 174, 176 (2d Cir.), cert. denied sub nom., Wood & Selick, Inc. v. Todd, 282 U.S. 881, 51 S.Ct. 85, 75 L.Ed. 777 (1930). When a District Court exercises its authority in approving a settlement offer, it must give comprehensive consideration to all relevant factors and yet the settlement hearing must not be turned into a trial or a rehearsal of the trial. *See also* West Virginia v. Chas. Pfizer & Co., *supra*, 314 F.Supp., at 741, 440 F.2d at 1085–1086. The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.

The question becomes whether or not the District Court had before it

sufficient facts intelligently to approve the settlement offer. If it did, then there is no reason to hold an additional hearing on the settlement or to give appellants authority to renew discovery. There is no doubt that it did. The Court specifically considered: (1) the complexity, expense and likely duration of the litigation, Detroit v. Grinnell Corp., *supra*, 356 F.Supp. at 1388–1389; (2) the reaction of the class to the settlement, *Id.* at 1385–1386; (3) the stage of the proceedings and the amount of discovery completed, *Id.* at 1386; (4) the risks of establishing liability, *Id.* at 1388; (5) the risks of establishing damages, *Id.*; (6) the risks of maintaining the class action through the trial, *Id.* at 1389–1390; (7) the ability of the defendants to withstand a greater judgment, *Id* at 1389; (8) the range of reasonableness of the settlement fund in light of the best possible recovery, *Id.* at 1387; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, *Id.* at 1385.

Appellants argue that the hearing which did precede the court's approval mocked justice because they were not given any authority of discovery from which they could fashion an effective presentation. More specifically, the objectors argue that, as a result of their inability to make additional demands for defendants' records, the District Court at no time considered the type of economic data which they declare to be indispensable to any competent judicial evaluation of a settlement offer. To support their claim, the objectors cite the Manual For Complex Litigation which provides that:

> Particularly in civil antitrust class actions in which settlements are proposed is the need of the court for reliable economic data great. In the absence of reliable economic data concerning the damage suffered by each class and subclass as a result of the alleged illegal conduct, a rational determination of what is fair and reasonable cannot be made.

Manual For Complex Litigation § 1.46 (1973).

The general request by appellants for economic information focuses on "data showing class damages" and asks the defendants to supply: a comparison in several other areas of the nation of the differences between defendants' prices and the lower prices of their admittedly peripheral competitors; the number of defendants' competitors; the nature and extent of their competition; and the sizeable barriers to new entry in the industry. What the appellants really seem to be asking for is the right to *begin* discovery from first principles. The record discloses that a great deal, if not all, of this information already exists in the depository and could have come to the attention of appellants' counsel if he had expended the necessary effort.

Appellant's claim that there was a need for further discovery to develop the facts falls flat in view of the extensive evidentiary base already available at the document depository.[8] The objectors asked the Court below to allow them to conduct discovery and to subpoena witnesses for the settlement hearing.

8. The inventory of the depository includes documents produced to the government, depositions taken in the government case, the entire record in the government case, documents produced by and depositions of defendants taken in the Philadelphia actions, as well as hundreds of thousands of additional documents demanded pursuant to Rule 34 by the plaintiffs in these cases. In addition many documents produced by the discovery procedures in the instant cases were placed in the depository. These documents include many spreadsheets of painstakingly assembled transaction data and calculations requested by plaintiffs to support damage theories they planned to assert. One answer by one defendant alone contains hundreds of thousands of statistics on transactions with subscriber plaintiffs. In addition, the documents produced by defendant ADT include the most detailed financial data (e. g., full revenue and cost analyses for each of its approximately 125 central stations) and more than 50,000 competition reports detailing the significant competitive factors pertinent to individual bids and transactions.

Counsel for appellants candidly admitted below, however, that he had not even read the record in the government enforcement action, nor had he spent much time in the document depository.[9] Rather, he remarked that it was not his duty to investigate the material that had already been produced. He claims that since the proponents of the settlement have the burden of justifying it to the satisfaction of the trial court, it remains their duty to produce documents and other evidence to substantiate the offer. He apparently feels that he may sit back and request the production of documents that have already been produced—documents with which he may be unfamiliar simply because he entered the litigation when it was already in an advanced stage.

■ In general the position taken by the objectors is that by merely objecting, they are entitled to stop the settlement in its tracks, without demonstrating any factual basis for their objections, and to force the parties to expend large amounts of time, money and effort to answer their rhetorical questions, notwithstanding the copious discovery available from years of prior litigation and extensive pre-trial proceedings. To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process. On their theory no class action would ever be settled, so long as there was at least a single lawyer around who would like to replace counsel for the class and start the case anew. To permit the objectors to manipulate the distribution of the burden of proof to achieve such an end would be to permit too much. Although the parties reaching the settlement have the ob-

ligation to support their conclusion to the satisfaction of the District Court, once they have done so, they are not under any recurring obligation to take up their burden again and again *ad infinitum* unless the objectors have made a clear and specific showing that vital material was ignored by the District Court. There is no need for the District Court to hold an additional evidentiary hearing on the propriety of the settlement. Its conclusion appears to have been reached only after a thorough investigation of all relevant facts.

III.

■ The District Court reserved judgment as to whether a class action ought to be permitted under the circumstances when the parties indicated that such a suspension of judgment would aid their settlement efforts. The settlement itself assumed the existence of a proper class under Rule 23, and for the purpose of approving the settlement, the District Court acquiesced in that assumption. The objectors' third assertion of error focuses on the fact that the District Court approved the class action urged by plaintiffs for the purpose of settlement only.

It is difficult to pinpoint the direction of this particular allegation. On the one hand, appellants seem to be saying that the fact that the District Court assumed the existence of a viable class for the purposes of settlement and refused to make the same legal finding for all other purposes was legal error sufficient in and of itself to void the settlement agreement—even though we are never told exactly why this is so. On the other hand, they seem to argue that because the District Court found a viable class for the purpose of settlement it was le-

9. "The Court: How many days were you there (at the depository)?
Mr. Kronfeld: We must have been at the depository at least four days.
The Court: What do you think you are going to get out of the depository in four days? The people in Chicago were there for three weeks, an individual plaintiff.

Have you gone through the government records from stem to stern?
Mr. Kronfeld: I have not, your Honor, but I have read the opinions of the courts and I have read some of the deposition testimony, and I have read some of the exhibits in the Government case . . .."
Appendix. Vol. I, at 561.

gally compelled to make a formal holding along the same lines that would be binding on all aspects of the litigation. The value of this latter argument to the objectors is somewhat remote. Supposedly, if such a formal holding were compelled, that holding would significantly reduce the contingencies of litigation as far as the plaintiffs were concerned. Their chances of ultimate victory on the merits would thereby be strengthened and they would, therefore, be entitled to a larger fraction of the ultimate recovery figure. Even if the objectors' reasoning on this issue were flawless, the extent to which such a conclusion would affect the propriety of the $10 million settlement is problematic at best. Fortunately, we are not to reach these heights of abstraction because we reject the initial premise of the argument.

The foundation of the objectors' claim can be found in the Manual For Complex Litigation (1973) which, in § 1.46, provides that:

> Care should be taken to avoid undesirable, premature, unauthorized settlement negotiations in class actions. Before any settlement negotiations occur, there should be a [formal] class action determination. Thereafter, all settlement negotiations on behalf of the class should be conducted by counsel representing the class in litigation.

The Board of Editors that made this recommendation was influenced by many factors. Chief among these elements was the danger, recognized by the Third Circuit in Ace Heating & Plumbing Co., Inc. v. Crane Co., *supra*, that anyone

> who unofficially represents the class during settlement negotiations may be under strong pressure to conform to the defendants' wishes. This is so because such an individual, lacking official status, knows that a negotiating defendant may not like his 'attitude' and may try to reach a settlement with another member of the class. . . . The attorneys' fees and prestige attendant upon probable appointment as class representative are the rewards for the attorney who bargains successfully with the defendants.

453 F.2d at 33.

The settlement in the case at hand was not negotiated in the early stages of the dispute. Here, all the parties had been able to assess the risks of success after almost four years of litigation. Similarly, the possibilities of internecine conflict were also neutralized by the fact that those national class representatives who had filed suit within the limitations period were all represented by the same counsel. No other representative surfaced until *after* the settlement agreement was reached and widely publicized. Thus, this is not a situation, such as that involved in Ace Heating & Plumbing Co., Inc. v. Crane Co., *supra*, where several different counsel were vying for recognition as class representatives; nor was it a case in which defendants were in any position to play one would-be representative off against the other. There is no allegation that the settlement conflicted with or was adverse to any class members' interest. The major concern of the Manual For Complex Litigation's recommendation against conditional approval of a viable class is absent in this case.

It is true that there were other, additional motivations behind the recommendation of the Board of Editors which proposed the Manual.[10] All of these rea-

---

10. Among the additional reasons stated by the Editorial Board are the following:

(1) Rule 23 [of the Federal Rules of Civil Procedure] does not authorize the formation of tentative classes for the purpose of settlement.

(2) There can be no assurance that the class members will be adequately represented in settlement negotiations until the findings which are conditions precedent to the formation of the class are made by the court after an opportunity for an evidentiary hearing.

(3) . . . It will be impossible to determine . . . the amount of money which will be payable to each member of the class. This information would seem to be essential to making any rational

sons expressed in various ways, the Manual's dissatisfaction with the type of settlement which rested on a tentative acceptance of the class designation and was then ultimately forced upon the alleged class with an ultimatum that prevented any effective challenge to the settlement by simply giving class members the choice of accepting its benefits or litigating individually. The instant settlement contained no such harsh directive. Instead, it provided for notice of a hearing and an opportunity to challenge the fairness or any other aspect of the proposed settlement.

To whatever minimal extent the action of the District Court violated the provisions of the Manual For Complex Litigation, it did so by applying the law in this Circuit. *See* West Virginia v. Chas. Pfizer & Co., *supra*; Ace Heating & Plumbing Co. v. Crane Co., *supra*. *See also* Philadelphia Electric Co. v. Anaconda American Brass Co., 275 F.Supp. 146 (E.D.Pa.1967); Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., 341 F.Supp. 1077 (E.D.Pa.1972), rev'd on other grounds, 487 F.2d 161 (3d Cir. 1973); 7A Wright & Miller, Federal Practice and Procedure § 1797 (1972). It must also be remembered that these recommendations were not meant to be intractable rules. If they were applied blindly and without an appreciation of their implicit limitations in given circumstances, they might well jeopardize the right of many plaintiffs to recovery and even invite the likelihood that certain class action suits might never be settled at all.

## IV.

 Finally, the objectors have argued that the District Court was persuaded in its decision to approve the settlement by considerations which both lacked evidentiary support and were improperly entertained and which, therefore, constitute grounds for reversal. They urge two specific contentions: (1) that in approving the settlement offer the District Court improperly concluded that it seemed likely that the defendants would be financially incapable of paying a larger judgment, Detroit v. Grinnell Corp., *supra*, 356 F.Supp. at 1389 and, (2) that in approving the settlement offer, the District Court was impermissibly influenced by the likely burden on the judicial system that would accrue if settlement of this class action could not be obtained. *Id.* at 1388–1389.

Appellants point out that the District Court only addressed the financial capabilities of defendants AFA and Holmes and did not consider the financial status of either Grinnell or ADT, the two larger defendants. According to the appellants, the lack of a complete inquiry is inexplicable in light of the fact that the liability of the defendants here is both joint and several. *See* Sabre Shipping

choice whether to remain in the class and to accept the benefits of the settlement or to opt out.

(4) . . . there cannot be a fair recognition in settlement negotiations of the potential liability of the party or parties opposing the class and the potential damages that might be recovered by the class.

(5) Formation of such a class preempts determination of whether the claim for relief should be litigated for the members of the class or should be the subject of further pretrial preparation with a view toward securing a better settlement or a trial on the merits . . . .

(6) The formation of the tentative class for the purpose of settlement denies to the class member the choice contemplated by the amended Rule 23 to become a member of the proposed class for the purpose of litigation with adequate representation as a member of the litigating class.

(7) Formation of such a class denies to a member of the class the right to appear in the action as a party and to maintain the position of a litigating party.

(8) Formation of such a class results in a long delay in preparation of the case for trial of those parties who desire to litigate their claims for relief.

(9) In the absence of reasonable discovery conducted on an adversary basis by counsel representing the class, it is impossible to determine whether the proposed settlement has any relation to the economic facts of life relevant to the case.

Manual For Complex Litigation, § 1.46 (1973).

v. American President Lines, Ltd., 298 F.Supp. 1339 (S.D.N.Y.1969). Moreover, they argue, even if all four plaintiffs could be shown to be impecunious, consideration of that fact was not legally permissible.

██ Appellants have cited no authority for the proposition that the defendants' ability to pay is an improper consideration when approving a settlement offer. Likewise, we are unable to find any such authority. Common sense seems to dictate the necessity, to say nothing of the propriety, of such a consideration. In fact, all available authority defies appellants' analysis. According to the United States Supreme Court:' "Further, the judge should form an educated estimate of the complexity, expense and likely duration of such litigation, *the possible difficulties of collecting on any judgment which might be obtained,* and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.". Protective Committee v. Anderson, *supra*, 390 U.S. at 424–425, 88 S.Ct. at 1163. ·(Emphasis supplied.)

Although it is true that the District Court did not specifically find that Grinnell and ADT could not bear more than their portion of the settlement, it is obvious that these companies too have their financial limits, particularly in light of the fact that in addition to this $10 million settlement, defendants have paid $12 million to competitors and still have additional cases to defend.

Appellants scoff at the fact that the District Court was persuaded to some degree to approve the settlement offer because if settlement could not be reached, the 14,156 claims filed for the settlement period "[would have to be individually tried, requiring] about 14,000 trial hours on the damage claims alone . . . or about 11 years" and possibly "several judges and juries" so that a "huge amount of judicial time of any single judge and his court personnel would be devoted to the matter." Detroit v. Grinnell Corp., *supra*, 356 F.

Supp. at 1888–1889. They assert that no authority exists which in any way suggests that burden on the judicial system is a factor to be considered in justifying judicial approval of a class action settlement. Furthermore, they argue that:·"The judicial system exists to dispense justice regardless of the burden that may be thrust upon it. And justice implies equal treatment of all litigants —not lesser treatment of those whose causes involve more of a burden on the ·judicial system than those of others." Appellants' Brief, at 47.

Appellants express an admirable sentiment, but until the day of unlimited judicial resources dawns, the fact will remain that each hour of judicial effort that is expended on the claim of one plaintiff will mean that fewer hours will be available for all others. Thus, the consideration of "judicial burden" does not really amount to a weighing of the interests of the courts against those of the plaintiffs, but rather it is a weighing of the *bona fide* interests of these plaintiffs against the interests of .all others who are pursuing just causes of action. Likewise, even if the judicial system would undertake the herculean task which the objectors claim is their right to impose, they offer no proof that any judgment that would be reached eleven years hence would be sufficiently large, when discounted, to reward the class members for their patience.

The appellants sense the inconsistency of their argument when they conclude by assuring this Court that the trial, when it took place, would not be as unwieldy as the District court portends.

> [T]he lower court clearly exaggerated the burden on the judicial system if these actions were tried on the merits. As this Court and the Judicial Panel have recognized, class action damage trials must be streamlined to permit recovery on the basis of statistical and other economic data.

Appellants' Brief, at 48.

Since there are few reported cases of class actions of this magnitude being lit-

468

igated all the way to final judgment on the individual class claims, it is not clear exactly how the trial could possibly be handled. Admittedly, the proof of damages in this type of case need not be made with precision and exactitude. *See* Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). Nevertheless, any suggestion that the alternative to the settlement of these actions is a relatively simple, quickly expedited, clearly defined pathway is both illusory and naive. On the contrary, it is obvious that litigating these cases to completion would take years—the real questions being how many years, at what cost, and with what result?

The evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice. Saylor v. Lindsley, 456 F.2d 896, 904 (2d Cir. 1972). The District Court has given us much more in this case.

A perusal of the District Court's opinion reveals without question that it was fully aware of the proper standards of settlement evaluation, that it applied each of those standards in its approval of this settlement, and that it entertained no improper considerations. Because the District Court applied the proper and normal standards in evaluating and approving the settlement offer, we can find no abuse of discretion on its part and, consequently, we affirm its decision.

## THE FEE AWARD

■ On December 27, 1972, the District Court rendered its decision approving the settlement and awarding attorneys' fees of $1.5 million, plus disbursements of $14,918.73, to David Berger and his law firm, David Berger, P.A.[11] A second group of appellants objects to the $1.5 million counsel fee award made by the District Court. These appellants claim that this fee award was completely out of proportion to any services performed by counsel and that it reflects the District Court's *de facto* reliance on the contingent fee approach, an approach which, they submit, is impermissible in this type of case. Moreover, appellants point out that contrary to the suggestions of the Supreme Court of the United States and in violation of its own order, the District Court in this case awarded the fee without accepting any testimony, without holding an evidentiary hearing and with only the benefit of oral argument before it.

■ Because we feel that this fee was excessive and displayed too much reliance upon the contingent fee syndrome and because we feel that an evidentiary hearing was imperative in this case, we reverse and remand this portion of the District Court's judgment and direct that Court to hold such hearings, consistent with this opinion, to provide sufficient information so that a fair and adequate fee award may be made.

■ Section 4 of the Clayton Act, 15 U.S.C. § 15 (1970),[12] which provides for the award of attorneys' fees in civil antitrust suits generally, does not authorize award of attorneys' fees to a plaintiff who does not recover a judgment or

---

11. Petitioner had filed a request for $2.5 million in fees. *See* Petition Of Counsel For The Class Representatives For Award Of Counsel Fees And Costs, Appendix, Vol. II, at 101.

12. Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court in the United States in the district in which the defendant resides, or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, *including reasonable attorney's fee.*

15 U.S.C. § 15 (1970). (Emphasis supplied).

who settles his claim with the defendant. Byram Concretanks, Inc. v. Warren Concrete Products Co., 374 F.2d 649, 651 (3d Cir. 1967). Similarly, Rule 23 of the Federal Rules of Civil Procedure has no fee provision. The only basis for awarding an attorney's fee in such cases is the equitable fund theory doctrine, which may be used to "make fair and just allowances for expenses and counsel fees to [those] parties promoting litigation. . . ." Trustees v. Greenough, 105 U.S. 527, 536, 26 L.Ed. 1157 (1881). "Allowance of such costs in appropriate situations" has been called "part of the historic equity jurisdiction of the federal courts." Sprague v. Ticonic National Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1938). *See also* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391–392, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Under this theory claims may be filed not only by a party to the litigation, but also by an attorney whose actions conferred a benefit upon a given group or class of litigants. The underlying principle here is that the members of the group should pay "compensation as was reasonable" above and beyond reimbursement for out-of-pocket expense to the attorney representing their interests. Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 125, 5 S.Ct. 387, 28 L.Ed. 915 (1885).

The practice of awarding attorneys' fees is one that has been "delicate, embarrassing and disturbing" for the courts. Milwaukee Towne Corp. v. Loew's Inc., 190 F.2d 561, 569 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S. Ct. 303, 96 L.Ed. 680 (1952). This embarrassment is rooted in the fact that "the bitterest complaints [about the legal profession] from laymen [are directed at] the windfall fees and featherbedding that lawyers have managed to perpetuate through . . . their influence with the judiciary." Graham, Guest Opinion on Legal Fees: Fluffing the Golden Fleece, Juris Doctor, 10, 11 (February, 1973).

Unfortunately, there has been more than a little justification for the dissatisfaction of the lay community with the application of the equitable fund doctrine under Rule 23. Criticism has been rampant even within the judiciary. In Illinois v. Harper & Row Publishers, 55 F.R.D. 221 (N.D.Ill.1972), the District Court observed that:

> If Rule 23 is to be preserved against *deserved* criticism, some attempt must be made by the court to suit the award of the fees to the performance of the individual counsel in light of the size of the settlement. Otherwise, the attorneys who are taking advantage of class actions to obtain lucrative fees will find themselves vulnerable to the criticism expressed in the Italian proverb, "A lawsuit is a fruit tree planted in a lawyer's garden."

55 F.R.D., at 224. (Emphasis supplied).

In a similar vein the United States District Court for the Southern District of New York pointed out: "[I]t [the Rule 23 class action] has resulted in miniscule recoveries by its intended beneficiaries while lawyers have reaped a golden harvest of fees." Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 30 (S.D.N.Y.1972). Finally, dissenting in Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968) (Eisen II), then Chief Judge Lumbard wrote: "Obviously the only persons to gain from a class suit are not the potential plaintiffs, but the attorneys who will represent them." 391 F.2d at 571.

For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding "windfall fees" and that they should likewise avoid every appearance of having done so. To this end courts must always heed the admonition of the Supreme Court in Trustees v. Greenough, *supra*, when it advised that fee awards under the equitable fund doctrine were proper only "if made with moderation and a jealous regard to the rights of those who are interested in the fund." 105 U.S., at 536. *See also* Wewoka v. Banker, 117 F.2d 839, 841 (10th

Cir. 1941). The award must be made with an eye to moderation and, if for no other reason but to allay suspicion, the court should typically take pains to allow a complete airing of all objection to a petitioner's fee claim.

█ In its simplest terms, the purpose of the fee award is to "compensate the attorney for the reasonable value of services benefiting the . . . claimant." Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corporation, *supra*, 487 F.2d, at 167. There are many parameters that affect the value of legal services and, which, therefore, must be considered by a court in evaluating a fee request. In another recent antitrust case the District Court which granted the instant fee petition enumerated those parameters. In Transworld Airlines, Inc. v. Hughes, 312 F.Supp. 478 (S.D.N.Y. 1970), modified on appeal, 449 F.2d 51 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), the District Court adopted the "generally accepted factors to be weighed in determining a reasonable attorney's fee" from Hanover Shoe, Inc. v. United Shoe Machinery Corp., 245 F. Supp. 258 (M.D.Pa.1965), vacated on other grounds, 377 F.2d 776 (3d Cir. 1967), aff'd in part and rev'd in part, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), *viz.*:

(1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government,

(2) the standing of counsel at the bar —both counsel receiving the award and opposing counsel,

(3) time and labor spent,

(4) magnitude and complexity of the litigation,

(5) responsibility undertaken,

(6) the amount recovered,

(7) the knowledge the court has of conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiff prior to trial,

(8) what it would be reasonable for counsel to charge a victorious plaintiff.

312 F.Supp., at 480.

Finally, the District Court added that the attorney's "risk in litigation" is another factor to be considered.

This conceptual amalgam is so extensive and ponderous that it is probably not employed in any precise way by those courts espousing adherence to it. That fact is brought home here by the opinion of the District Court which, while eschewing any reliance upon a percentage fee approach, ostensibly applied these cumbersome rules but nevertheless concluded that the fee award ought to amount to $1.5 million, namely, fifteen percent of the settlement recovery.

As the Third Circuit has recently pointed out in Lindy Bros., *supra*, more is needed than a mere listing of factors. Such a list, standing alone, can never provide meaningful guidance.

█ The starting point of every fee award, once it is recognized that the court's role in equity is to provide just compensation for the attorney, must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.

No one expects a lawyer to give his services at bargain rates in a civil matter on behalf of a client who is not impecunious. No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended. Yet unless time spent and skill displayed be used as a constant check on applications for fees there is a grave danger that the bar and bench

will be brought into disrepute, and there will be prejudice to those whose substantive interests are at stake and who are unrepresented except by the very lawyers who are seeking compensation.

Cherner v. Transitron Electronic Corp., 221 F.Supp. 55, 61 (D.Mass.1963).

■■ Once the District Court ascertains the number of hours that the attorney and his firm spent on the case, it must attempt to value that time. Valuation obviously requires some fairly definite information as to the way in which that time was spent (discovery, oral argument, negotiation, etc.) and by whom (senior partners, junior partners or associates). Once this information is obtained the easiest way for the court to compute value is to multiply the number of hours that each lawyer worked on the case by the hourly amount to which attorneys of like skill in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation.

> A logical beginning in valuing an attorney's services is to fix a reasonable hourly rate for his time—taking account of the attorney's legal reputation and status (partner, associate). Where several attorneys file a joint petition for fees, the court may find it necessary to use several different rates for the different attorneys. Similarly, the court may find that the reasonable rate for compensation differs for different activities.

Lindy Bros., *supra*, 487 F.2d at 167.

■ We are not under the illusion that a "just and adequate" fee can necessarily be ascertained by merely multiplying attorney's hours and typical hourly fees. However, we are convinced that this simple mathematical exercise is the only legitimate starting point for analysis. It is only after such a calculation that other, less objective factors, can be introduced into the calculus.

■ Perhaps the foremost of these factors is the attorney's "risk of

litigation," *i. e.*, the fact that, despite the most vigorous and competent of efforts, success is never guaranteed. The greater the probability of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee. The tangible factors which comprise the "risk of litigation" might be determined by asking the following questions: has a relevant government action been instituted or, perhaps, even successfully concluded against the defendant; have related civil actions already been instituted by others; and, are the issues novel and complex or straightforward and well worn? Thus determined, the litigation risk factor might well be translated into mathematical terms.

It may be argued that by minimizing the important role traditionally played by the magnitude of the recovery, there will be considerably less incentive for the class attorney, particularly when negotiating a settlement, to seek as high a recovery as possible. Conversely, it can be complained that such a rule will encourage counsel to avoid quick settlement or, indeed, any settlement, in hopes of prolonging the proceedings and accumulating billable hours. Although there may be some truth in these arguments, we feel that their impact can be minimized by an intensified scrutiny on the part of the court which must approve each negotiated settlement.

When it sets a monetary value on a lawyer's services, the District Court must be in possession of an enormous amount of information. It must know how much each contributing lawyer devoted to each task resulting in the formation of the settlement fund; it must be aware of the billing rate properly applied to each of these manhours; and it must be sensitive to those factors, tangible and intangible, which comprise the "risk of litigation."

Because this information is so vital, Rule 11B of the Local Rules of the

Southern District of New York provides that:

> Fees for attorneys or others shall not be paid upon the recovery or compromise in a derivative or class action on behalf of a corporation or class except as allowed by the court after a hearing upon such notice as the court may direct.

And, since resolution of disputed factual issues necessitates the hearing of testimony, *see* Ellis v. Flying Tiger Corporation, No. 71–1704 (7th Cir. October 27, 1972) and is particularly facilitated by cross-examination, *see* Milwaukee Towne Corp. v. Loew's Inc., 190 F.2d 561, 571 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952), one appellate court has been prompted to hold that: "[A]lthough expert opinion evidence is not required in awarding attorneys' fees, where the facts to be weighed in light of the judge's expertise are disputed, an evidentiary hearing is required. *See* Thomas v. Honeybrook Mines, Inc., 428 F.2d 981, 988–989 (3d Cir. 1970), cert. denied, 401 U.S. 911, 91 S.Ct. 874, 27 L. Ed.2d 809 (1971)." Lindy Bros., *supra*, 487 F.2d at 169.

The Supreme Court endorsed this view in cases involving the award of attorneys' fees under Section 4 of the Clayton Act. In Perkins v. Standard Oil Co., 399 U.S. 222, 90 S.Ct. 1989, 26 L. Ed.2d 534 (1970), the Court stated that: "[T]he amount of the award for such services should, as a general rule, be fixed in the first instance by the District Court, after *hearing evidence* as to the extent and nature of services rendered." 399 U.S., at 223, 90 S.Ct., at 1990 (Emphasis supplied). *See also* West v. H. K. Ferguson Company, 382 F.2d 630, 633 (10th Cir. 1967); In re Hudson & Manhattan Railroad Compa-

ny, 339 F.2d 114, 115 (2d Cir. 1964); In re Hardwick & Magee Company, 355 F. Supp. 58, 75 (E.D.Pa.1973); Lewis v. Wells, 325 F.Supp. 382, 387 (S.D.N.Y. 1971).

In the instant case the District Court sent a legal notice, dated December 13, 1971, to all class members informing them of the prospective settlement. Paragraph 6 of that notice proclaimed that:

> [T]he Court has directed that a hearing be held on April 27, 1972 . . . . [A]ny member of the class who has not requested exclusion and has timely filed a Sworn Statement of Claim may appear at such hearing in person or by counsel and may show cause, if any he has, . . . why fees and allowances should not be granted and why judgments thereon should not be entered, and may present any evidence that may be proper and relevant to the issues to be heard. . . .

Appendix, Vol. II, at 78.

Contrary to the terms of this notice, the Court made its fee award after it had refused to hold an evidentiary hearing, Hearing of April 10, 1972, at 3, and with only the benefit of oral argument and submitted papers to guide it, in spite of the fact that counsel for the appellants stated to the Court that he "proposed to present evidence" on the matter of the fee application. Excerpts from Transcript of Hearing Before Judge Metzner, May 24, 1972, Vol. II, at 504; Excerpts from Transcript of Hearing Before Judge Metzner, June 5, 1972, Vol. II, at 558. The most basic dispute focuses on petitioner's claim, rejected by both appellants and third parties, that he and the members of his firm expended 2,357 hours in the litigation of this case.[13] *See* Statements of Messrs. Rob-

---

13. Appellee Berger claims to have expended 2,357 hours of attorney's time on behalf of these plaintiffs without regard to the type of work and by whom performed, namely, partner, senior associate, junior associate or clerk. The District Court fee award of $1.5 million thus compensated him at the rate of $635 per attorney-hour.

Appellee has attempted to justify his fee by pointing to other cases where the fee awards were even more grandiose. He observes that in one dispute litigated in the

inson, Hoffman & Stein, Appendix, Vol. II, at 270, 296, 242. There is no doubt that, in a case such as this, where there were many vigorous disputes of fact over the elements that comprised the fee award, an evidentiary hearing, complete with cross-examination, is imperative.

Even if there were no disputes over the claims made by petitioner, there would still remain a need for an additional hearing to fill the many factual voids which remain before an adequate fee can be fairly determined. Petitioner lumps together the hours for four lawyers in his office whom he calls "senior attorneys" and who allegedly spent 1,-814 hours on this case, yet he does not define what he means by the term "senior attorney". Petitioner, likewise, provides no breakdown of any of the time claimed into the various facets of the case. It is conceivable that large amounts of time could have been spent on comparatively routine matters or in ministerial duties.

The court will need to know the experience and training of petitioner's paraprofessional assistants and the rate at which he pays them since he must be reimbursed for their wages even though their time cannot be considered as input in the fee award determination. *See* In re Hardwick & Magee Co., *supra*, 355 F.Supp. at 58, 73; Trans World Airlines, *supra*, 312 F.Supp., at 482. Finally, there is insufficient evidence regarding petitioner's separate fee arrangements with various members of the classes he represented. Such information is vital to the determination of a fair and adequate fee. *Lindy Bros., supra*, 341 F.Supp., at 1090.

The guidelines to be followed on such a hearing which we adopt have been well summarized in the *Lindy Bros.* case, *supra*, 487 F.2d, at 167, 170.

To this end the first inquiry of the court should be into the hours spent by the attorneys—how many hours were spent in what manner by which attorneys. It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the hours devoted to various general activities, *e. g.*, pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, *e. g.*, senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought.

\* \* \* \* \* \*

The value of an attorney's time generally is reflected in his normal billing rate. A logical beginning in valuing an attorney's services is to fix a reasonable hourly rate for his time—taking account of the attorney's legal reputation and status (partner, associate).

\* \* \* \* \* \*

Further, in increasing or decreasing an attorney's compensation, the district judge should set forth as specifically as possible the facts that support his conclusion, particularly where, as in this case, the judge determining the fees to be awarded did not sit in the case throughout the entire proceeding. The value to be placed on these additional factors will, of course, vary from case to case. Often, however, their value will bear a reasonable relationship to the aggregate hourly compensation.

We conclude, as did the Circuit Court in *Lindy Bros., supra*, that "the failure of the district court to hold an evidentiary hearing and its failure to follow

New York State courts, a distinguished practitioner was compensated at the rate of $3,590 per hour. Sullivan and Cromwell v. Hudson and Manhattan Corporation, 35 A.D.2d 1084, 316 N.Y.S.2d 604 (1st Dep't 1970), aff'd, 29 N.Y.2d 523, 324 N.Y.S.2d 79, 272 N.E.2d 572 (1971).

However, instead of bolstering his position, these observations merely illustrate the results that accrue when a fee is awarded on a contingency basis without reference to the labor actually expended on the client's behalf.

proper standards in awarding fees to attorneys Kohn and Berger were inconsistent with the sound exercise of discretion."

## FEE APPORTIONMENT

In addition to the fee petition of counsel for the class representatives, at least three other fee petitions were presented to the Court below.

The three firms of (a) Weil, Gotshal & Manges, (b) Liebman, Eulau, Robinson & Perlman, and (c) Parker, Chapin & Flattau, constitute the so-called "troika", counsel for a number of individual plaintiffs. The "troika" has laid claim to twenty-five percent of the fee awarded class counsel on the ground that their efforts contributed to the formation of the settlement fund. A second attorney, Joel E. Hoffman, of Wald, Harkrader & Ross, likewise filed a petition, Application of Wald, Harkrader & Ross For Apportionment of Counsel Fees, Appendix, Vol. II, at 236, for ten percent of any fee awarded class counsel on the ground that his participation in the pre-trial proceedings conferred a benefit on the class. Finally, Pritchard, McCall & Jones, counsel for certain other plaintiffs, also sought fees for work done in their client's behalf. Application of Pritchard, McCall & Jones For Allowance of Attorneys' Fees, Appendix, Vol. II, at 230.

The District Court held that the three law firms constituting the "troika", along with the firm of Wald, Harkrader & Ross, had standing to assert claims against the fee awarded class counsel. Detroit v. Grinnell Corp., *supra*, 356 F. Supp. at 1393. The Court said that it would set a date for a hearing to determine whether any benefits accrued to the national classes from the activities of these other counsel, and whether the Court should, in equity, award them part of class counsel's fees. *Id.* The Court denied the fee application of Pritchard, McCall & Jones.

■ Appellants contend that none of these additional fee applications should be entertained by the District Court. Since none of these fees has as yet been allowed, this question is not yet ripe for review and we therefore dismiss this portion of the appeal for lack of jurisdiction.

The basic policy of the federal courts has been that appeal will lie only from a "final decision." Cobbledick v. United States, 309 U.S. 323, 324, 60 S.Ct. 540, 84 L.Ed. 783 (1940). "[A] 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). Obviously, the District Court's holding with respect to the standing of the additional petitioners is anything but a "final decision". To support their position appellants are forced to rely on the "collateral order" exception to the final judgment rule which was stated by the Supreme Court in Cohen v. Beneficial Industrial Loan Company, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). An order which would otherwise be nonappealable may be appealed when it

> appears to fall in that small class which finally determines claims of right separable from and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.

*Cohen, supra,* at 546, 69 S.Ct., at 1226.

These appellants have not demonstrated the applicability of the *Cohen* exception. Indeed, the very language of the *Cohen* decision militates against the appealability of this portion of the District Court's opinion. The Supreme Court specifically cautioned that the exception does not apply "even from fully consummated decisions, where they are but steps towards final judgment in which they will merge." *Cohen, supra,* at 546, 69 S.Ct., at 1225. There can be no doubt that the District Court's recogni-

tion of standing and call for a hearing on the fee applications fits squarely into the definition of an act which is merely a "step . . . toward final judgment in which [it] will merge." *Compare* Gibbs v. Blackwelder, 346 F.2d 943 (4th Cir. 1965). A final judgment will arise only when the District Court makes a final apportionment of the fee.

The judgment approving the settlement is affirmed; the judgment as to the fee award is reversed and remanded for a hearing in accordance with this opinion; the judgment relating to the standing of other attorneys to participate in any fee award is dismissed for lack of appellate jurisdiction. Costs to abide the event.