Charles HEIT, Plaintiff,

v.

AMREP CORPORATION, Irving W. Blum, Howard W. Friedman, Chester Carity, H. L. Hoffman, Daniel Friedman, S. H. Friend, W. G. Baker, Jr., M. S. Roberts, Jerome Helson and J. K. Lasser & Co., Defendants.

Eulalie BRYAN and Gladys Husted, Plaintiffs,

v.

AMREP CORPORATION, Rio Rancho Estates, Inc., ATC Realty Corp., Howard W. Friedman, Chester Carity, Irving W. Blum, Henry L. Hoffman, Solomon H. Friend, Daniel Friedman and M. S. Roberts, Defendants.

Robert A. ROSS, on behalf of himself and all other persons similarly situated, Plaintiff,

v.

AMREP CORPORATION, ATC Realty Corp. and Rio Rancho Estates, Inc., Defendants.

Nos. 75 Civ. 1365 (MEL), 75 Civ. 5911 (MEL) and 77 Civ. 3799 (MEL).

United States District Court, S. D. New York.

April 5, 1979.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff Charles Heit.

Mordecai Rosenfeld, New York City, for plaintiff Bryan and class counsel.

Kreindler & Kreindler, New York City, for plaintiff Husted and co-counsel for the class.

Schoengold & Sporn, P. C., New York City, for plaintiff Robert A. Ross; Kenneth A. Elan, Bayside, N. Y., of counsel.

Jacobs, Persinger & Parker, New York City, for defendants.

LASKER, District Judge.

Settlement proposals in these three class actions have been presented to the court for approval pursuant to Rule 23.1, Fed.R. Civ.P. Subject to the conditions specified below, the settlements are approved.

The actions giving rise to these lawsuits are described at length in prior decisions of this court [1] and in parallel criminal proceedings.[2] The following is a short summary. *Ross v. Amrep, et al. (Ross)* and *Bryan and Husted v. Amrep, et al. (Bryan and Husted)*, are suits by purchasers of land at Rio Rancho Estates, a real estate development in New Mexico wholly owned by Amrep Corporation. The plaintiffs allege that Amrep and its employees used high pressure sales techniques to induce them to pay large sums of money for essentially worthless lots of arid desert land. The alleged misrepresentations, said to have been made in films, written advertisements, property records, offering statements and at sales dinners, included gross exaggerations as to the value of the land, its potential for resale, the availability of water and other utilities necessary for development, and the exchange privilege [3] attaching to the lots sold. Both complaints allege violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701–1720, as well as state and common law. The *Ross* class members purchased their land between January 1st and November 20, 1972; the *Bryan and Husted* members purchased between November 21, 1972, and May 2, 1977.

*Heit v. Amrep, et al.*, brought on behalf of purchasers of stock in Amrep Corporation, alleges that Amrep, together with J. K. Lasser & Co., Amrep's public auditors, knowingly issued false Annual Reports from 1972 through 1975 in violation of federal securities and common law. The Reports are said to be false in that, *inter alia*,

1. *Bryan v. Amrep, et al.*, 429 F.Supp. 313 (S.D. N.Y.1977); *Husted v. Amrep, et al.*, 429 F.Supp. 298 (S.D.N.Y.1977).

2. *United States v. Amrep, et al.*, 560 F.Supp. 539 (2d Cir. 1977).

3. The contracts for the sale of residential lots at Rio Rancho entitle the purchaser to exchange his property for a lot of "comparable value" in a developed area without charge if the purchaser is prepared to build a house. However, the areas of "comparable" exchange contain only a minimum of amenities, including dirt roads, overhead utility lines and septic tanks. To exchange in an "upgrade" area, with paved roads, underground utilities, central sewage, and greater proximity to Albuquerque, the purchaser merely receives a credit (recently approximately $3,500.) against the cost of the lot which may be in the range of $8,000. to $25,-000.

they failed to disclose that Amrep's profits were based on fraudulent sales practices which artificially inflated the corporation's profits and the price of its stock during the period in which the class members made their purchases.

## I.

The terms of the three settlement proposals are set out below. The proposals in each case provide that either side may withdraw if approval of the settlement in any of the other cases is denied.

The settlement in *Bryan and Husted* provides for payments to class members of a total of $1,775,000. in the form of cash or credits against future payments on contracts for the purchase of lots.[4] Those class members who visited their property within six months of purchase, and were therefore entitled under the terms of their sales contracts to cancel their purchases upon inspection, are to receive a 6% cash or credit refund of the amount of their principal payments. Those who did not inspect their property within this period, and therefore could not take advantage of the six month cancellation privilege, are to receive 10½%. In addition, Amrep has agreed to donate 400 acres of land at Rio Rancho for public use, to spend up to $350,000. on recreational improvements at Rio Rancho during the next ten years, and to maintain for a specified period of time a list of lots for resale by consumer purchasers. The agreement also provides that the defendants will pay plaintiffs' attorneys' fees in an amount to be approved by the court of up to $350,000.·

The *Ross* settlement provides for distribution to the class members of cash payments or credits against future payments of a total of $250,000., less attorneys' fees in the suggested amount of 30% of the total ($75,000.). The non-cash benefits in *Bryan and Husted*, including the public parkland, recreational facilities and the listing service, also attach to the settlement in *Ross*.

The *Heit* settlement proposes that Amrep issue $1,000,000. in ten year subordinated debentures to be distributed pro-rata to the class members, as well as payment of fees to plaintiffs' counsel in an amount, to be approved by the court, of no more than $250,000.

All plaintiffs' counsel represent that the settlements constitute the best available compromise between securing immediate monetary relief for the class members and safeguarding their investment by avoiding the imposition of a crippling financial burden on Amrep which might force it out of business. However, staff members of the Federal Trade Commission (FTC), which in 1975 issued a complaint against Amrep charging it with violations of the Federal Trade Commission Act, 15 U.S.C. §§ 41–51, arising in part out of the actions which are the subject matter of these lawsuits, have addressed several letters to the court stating that the settlement provisions in *Ross* and *Bryan and Husted* are inadequate. An evidentiary hearing was held on August 4, 1978, to offer testimony as to certain of the objections raised by the Commission. Those objections and others are considered below.

Two public hearings were also held to provide class members an opportunity to express their views as to the settlements. Over two hundred class members appeared at the hearings. The consensus was largely negative. Most of those who spoke were members of the classes in the land purchase cases. Their collective conclusion was that the land at Rio was worthless and that the proposed refunds (between 1 and 2% of investment in *Ross* and 6 and 10½% in *Bryan and Husted*) were too negligible to justify approval of the settlements.

The strong opposition of the many class members who appeared at the hearings has caused us to examine the proposals with particular care. However, it is appropriate

4. The settlements in *Ross* and *Bryan and Husted* provide that any class member with an executory purchase agreement on the effective date of the settlement "shall" receive a credit against future payments, while plaintiffs who have defaulted on their sales contracts are to receive a cash refund. See Notices of Settlement in *Ross* (p. 4) and in *Bryan and Husted* (p. 4).

to note that many of those who spoke at the hearing seemed not to have considered certain essential factors, including the weaknesses of the plaintiffs' cases, the question whether Amrep has the financial ability to withstand a larger settlement, and the possibility that the land at Rio Rancho may have some value, which the court must take account of in reviewing the merits of the settlements. Moreover, as a result of the dissatisfaction aired at the initial hearing, counsel in *Ross,* the least generous of the settlements, have agreed to permit a new period for the members of that class to opt out if the settlements are approved. (Transcript of Hearing, June 30, 1978, p. 20)

## II.

■ The standards to be applied in reviewing a settlement have been fully articulated in earlier cases. The most important factor "is the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement." *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 740 (S.D.N.Y.1970); *aff'd,* 440 F.2d 1079 (2d Cir. 1971). However, since the very purpose of settlement is to avoid trial, approval of a settlement does not depend on an exact determination of the merits of a dispute. Rather, as the Court of Appeals stated in *City of Detroit v. Grinnell,* 495 F.2d 448, 468 (2d Cir. 1974), "[t]he evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice." See also, *Zerkle v. Cleveland-Cliffs Iron Co.,* 52 F.R.D. 151, 159 (S.D.N.Y.1971). Moreover, as the product of lengthy bargaining between lawyers well acquainted with the applicable law and facts, these settlements are presumed to be fair and reasonable. *Saltzman v. Technicolor, Inc.,* 51 F.R.D. 178, 186 (S.D.N.Y.1970); *Josephson v. Campbell,* [1967–69 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,347, at 97,658 (S.D.N.Y.1969).

■ The fraud alleged in the complaints is of considerable magnitude. Eulalie Bryan alleges that she alone paid more than $6,000. for land which she states she later discovered had a market value of only $165. (Second Amended Consolidated Complaint, ¶¶ 3(a) and 13) Since the class members in *Ross* and *Bryan and Husted* number well over 10,000, the total damages, if the plaintiffs prevailed, would be many times the amount which Amrep proposes to pay in settlement.

Nevertheless, the plaintiffs' suits have suffered from severe problems from the start, both in terms of technical barriers to suit and problems of proof. There is a serious question whether the claims under the Interstate Land Sales Act, which are at the heart of the complaints in *Ross* and *Bryan and Husted,* are barred by the Act's statute of limitations. This problem is discussed at length in earlier opinions of this court [5] holding that *Bryan and Husted* (at that time separate lawsuits) were not barred by the statute of limitations, but only on condition that the plaintiffs could establish at trial that the fraudulent conduct of the defendants continued beyond the date that the sales contracts were signed. The time bar issue is even more acute in *Ross* which covers an earlier period than that involved in *Bryan and Husted.* Following the filing by defendants of a motion for summary judgment based on a statute of limitations argument, the plaintiffs in *Ross* stipulated to dismissal without prejudice of an earlier complaint brought on similar claims. The viability of the present *Ross* complaint depends on an equitable tolling argument which has, as yet, received only isolated support in the case law, see *Fuls v. Shastina Properties, Inc.,* 448 F.Supp. 983 (N.D.Cal.1978); *Happy Investment Group v. Lakeworld Properties, Inc.,* 396 F.Supp. 175 (N.D.Cal.1975),[6] and is

5. *See* note 1 *supra.*

6. Compare *Fuls* and *Happy Investment Group* with *Timmreck v. Munn,* 433 F.Supp. 396, 407–08 (N.D.Ill.1977); *Bongratz v. WL Belvidere, Inc.,* 416 F.Supp. 27, 29 (N.D.Ill.1976); *Hester*

*v. Hidden Valley Lakes, Inc.,* 404 F.Supp. 580, 582–83 (N.D.Miss.1975). See also, *Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. 283, 289–91 (W.D.N.Y.1977).

somewhat at odds with the language of the Act. See § 1412, 15 U.S.C. § 1711.[7]

It is also clear that plaintiffs may have considerable difficulty in proving their claims. The lengthy record compiled during the successful criminal prosecution of Amrep and certain of its employees appears to be of little value here, since the criminal case focused on Amrep's operations in the 1960s, an earlier period than that dealt with in these cases. Moreover, an examination of Amrep's sales literature during the periods encompassed by both the criminal and civil actions indicates that the representations made as to the development of Rio Rancho were considerably toned down in the later years. The change in sales-pitch is illustrated by comparing the language in sales brochures used in 1963 and in 1972:

(1963):

> Your Two-Fold Opportunity at Rio Rancho Estates
>
> 1. To secure a future retirement spot for you and your family at prices and terms that are ridiculously low as compared with all other prevailing land prices (and terms) in the Albuquerque area. A fact you can easily check to convince yourself that this is truly a genuine land bargain without equal! Nothing in this entire area even comes close!
>
> 2. The opportunity of a lifetime for a small investment to grow into a sizable fortune in an area where land values are constantly doubling, redoubling and then redoubling again . . . often in just a few years. It is a demonstrable fact that land prices in general at Albuquerque have increased 20, 30, even 50 times or more in the past 20 years. Now with its greatest population boom only just starting—one does not have to be an expert to predict that land prices here should increase in the future as they have

in the past . . . and more likely at an even greater pace!

> Let us, in the following pages, examine this land "buy" more closely. Let us step one foot outside the limits of Metropolitan Albuquerque . . . to Rio Rancho Estates . . . and see how and why you can buy CHOICE HOMESITE LAND here for hundreds of dollars instead of the thousands you'd have to pay everywhere else at Albuquerque—indeed, for land right up to our very doors!

(1972):

> Your Two-Fold Opportunity at Rio Rancho Estates
>
> 1. To secure a future retirement spot for you and your family at prices and terms so advantageous that you no longer need to be wealthy to control valuable property in the desirable Rio Grande Basin area of Albuquerque.
>
> 2. To obtain land that has a reasonable long-term potential. No one can predict the future with any certainty, but because Albuquerque is surrounded on three sides by Federal, Reserved or Canyon Lands, the Northwest Mesa where Rio Rancho Estates is located, appears to us to be in the logical path of progress. This is where Rio Rancho Estates is now a viable community, with hundreds of homes occupied and more under construction, with its own shopping center, post office, industrial park, and variety of recreational facilities.
>
> Let us, in the following pages, examine this land opportunity more closely. Let us see how and why you can buy FINE HOMESTEAD LAND at Rio Rancho Estates on such easy terms and at such reasonable prices. (Rosenfeld Affidavit, June 10, 1978, pp. 10–12)

Counsel for *Bryan and Husted* also acknowledge that they may have difficulty

---

7. "No action shall be maintained to enforce any liability created under section 1709(a) or (b)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 1709(b)(1) of this title, unless brought within two years after the violation upon which it is based. *In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser.*" (emphasis added)

establishing the claims in those cases that utilities and other amenities necessary to develop a full residential community at Rio Rancho are unavailable. Mordecai Rosenfeld states that he and co-counsel have made several trips to Rio during which they ascertained from state officials that the supply of water at Rio is plentiful for the foreseeable future, that the sewage plant is by and large excellent, and that electricity to meet the development's power needs is available at reasonable costs. (Rosenfeld Affidavit, June 10, 1978, pp. 17–18) Moreover, since the focus of the two land actions is on the interests of purchasers who did not intend to build homes at Rio Rancho, counsel inquired particularly into the investment value of the land. While growth at Rio has fallen far short of the expected development represented in the early sales literature, the population in the area is doubling approximately every 4½ years, a substantial number of homes are built at Rio each year (500 in 1977), and a small but ongoing market exists for the purchase of undeveloped lots to take advantage of the exchange privilege which attaches to them.[8] (*Id.*, pp. 19–26)

Accordingly, as counsel's research indicates, plaintiffs would have formidable obstacles proving their claims and thus settlement of the cases may well be in their interests. Nevertheless, the FTC staff raises the following objections to the proposals in *Ross* and *Bryan and Husted*: that the amount of the cash or credit refunds in the two cases is too low; that language in the Stipulations of Settlement and notice to the plaintiff classes concerning the preclusive effect of the settlements on the ability of class members to benefit from a possible subsequent restitution action by the FTC is confusing and overbroad; and that the non-cash benefits are in various respects unacceptable. We now consider these objections.

### III.

*Amount of Cash and Credit Refunds*

The FTC argues that the total amount of money to be returned to the class members in cash or credits against future payments is inadequate since it represents only a small fraction of the money paid to Amrep by the class members and only a small part of Amrep's total assets. This criticism must be evaluated in light of Amrep's financial position as set forth in its consolidated balance sheet for the period ending April 30, 1978, and testimony by officers of Amrep as to the corporation's financial condition given at the evidentiary hearing during which the witnesses were cross-examined by FTC staff counsel.

Amrep's major assets are non-liquid. They include: $13.5 million of plant and equipment, largely utility systems, which are in place and cannot be used to pay off Amrep's debts;[9] land holdings of $22.6 million which are of no practical value since Amrep's land sales are at a halt;[10] and $5.2 million attributable to goodwill (without realizable value) from the purchase of Kable News, Co. Out of its $4 million in cash, Amrep represents that $2.5 million is necessary for the corporation to operate, while the rest will largely be devoted to the settlements. (Letter of Jacobs, Persinger & Parker, June 9, 1978, p. 2) Moreover, Amrep's accounts receivable, consisting of land

---

8. There is also some question as to whether the claim of fraud under § 1404 of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703, made in *Ross* and *Bryan and Husted* is susceptible to class treatment since individual sales techniques, such as oral representations at sales dinners, were used to induce purchases of lots. See *Bryan v. Amrep, supra,* 429 F.Supp. 313, 319–320.

9. For instance, this item includes a sewage treatment plant and a water facility at Rio Rancho.

10. As counsel for Amrep explained in a letter to the court, Amrep's sales offices throughout the United States have been closed and many of its subsidiary sales corporations have been liquidated. Moreover, Amrep is no longer registered under the Interstate Land Sales Full Disclosure Act, and some states have suspended registrations necessary for the sale of Amrep's land. Letter of Jacobs, Persinger & Parker, July 13, 1978, p. 2.

contracts in the amount of $17.6 million, have been pledged as collateral for a loan by General Electric Credit Corporation on which $16 million is presently owing. In addition to the General Electric Loan, Amrep has liabilities of $4.7 million in outstanding mortgages, and $16.7 million to complete required improvements on its property.

At the evidentiary hearing, several of Amrep's employees gave testimony which credibly supported the bleak financial picture set out in the 1978 balance sheet. Amrep's assistant treasurer testified that the corporation's net income for 1978 was only $13,000. and that no assets are available to be drawn on to increase the settlement amount. Counsel for the FTC was unable on cross-examination to uncover any sources of income which might have been overlooked. Accordingly, we find that, even if the plaintiffs were to prevail, funds are simply not presently available to sweeten the settlement without destroying Amrep and adversely affecting, at least temporarily, plaintiffs' investment.[11]

### Effect of the Settlement on Future Claims Against Amrep

Section 19 of the Federal Trade Commission Act, 15 U.S.C. § 57b, provides that the Commission may commence a civil action against any corporation which violates any rule under the Act respecting unfair or deceptive acts or practices. The court in which such a suit is brought "may grant such relief as the court finds necessary to redress injury to consumers," including rescission, reformation of contract, refund of money, return of property, or payment of damages.

The FTC staff expresses concern that Paragraph 14(c) of the Stipulations of Settlement and the material in the notice to members of the classes may lead class mem-

bers to believe that, if the court approves the settlement, class members who have not opted out will have released or waived any right they might have to share in the proceeds of any recovery which the Commission might secure if it brings a § 19 suit.

To avoid such consequences, the Commission requests that the Stipulations of Settlement be amended by adding "an explicit exemption protecting the rights of class members to benefit from such [a § 19] action." (Letter of June 2, 1978, p. 10) The staff also expresses concern that the language of the Stipulations and notice may "inappropriately influence the decision of class members as to whether to participate in the settlements."

On a studied review of the relevant language (Paragraph 14(c) of the Stipulations; see also pages three and seven of the notices in *Bryan and Husted* and *Ross*) we find that the language of the Stipulations and notice is clear and accurate. Read as a whole, the language of the Stipulations and of the two relevant pages of the notice fully informs the members of the class that if they do not opt out and if the settlement is approved, the members will be barred from any further recovery against Amrep or any of its affiliates, officers, or agents or from raising any claims which could have been asserted in connection with or which arise out of any of the matters or transactions alleged in the complaint. Moreover, the notice makes it clear that if the settlement is approved "it will be asserted and *may* operate as a bar to the relief, if any, to be sought by the FTC if it should ever bring such a suit on your behalf." (emphasis added) (See Notice of Settlement in *Bryan and Husted*, p. 7) The totality of this information states the facts accurately and does not appear to include any information which would "inappropriately" influence the decisions of the class members.

---

11. Unlike counsel, we do not believe that the lot holders' interests are necessarily dependent on the viability of Amrep whose operations could be carried on by another enterprise in the event Amrep went bankrupt. However, since considerable disruption would be inevitable between the time when Amrep went bankrupt

and another corporation stepped in, we agree with counsel that the plaintiffs in *Ross* and *Bryan and Husted* would be better off if Amrep stayed in business. Moreover, it is likely that stockholders of Amrep, such as the class members in *Heit*, would lose their entire investment in the event that Amrep ceased to operate.

A second strand of the FTC's concern is that approval of the settlement here will actually operate to bar class members from sharing in any FTC secured relief, if there is any, in the future. No authority exists as to whether approval of a class action upon the terms specified in this case would as a matter of law act to bar members of the plaintiff class from sharing in relief secured by the FTC under § 19. Nothing inherent in the application for approval of the settlement requires us to make any such determination, and we explicitly decline to do so, leaving the matter for future disposition in the event that the FTC brings a § 19 suit and prevails. We also decline to require that the Stipulations of Settlement be amended to include a provision explicitly protecting the rights of class members to benefit from a possible FTC action since to do so would be to upset the settlement which, as discussed below, we believe is the best that the plaintiffs can hope to secure in the circumstances and from which they will receive some actual benefit, while the possibility of an FTC § 19 suit remains speculative.

*Promotion of a Resale Market*

The FTC staff contends that Amrep should be required to take affirmative steps to promote the development of a resale market for the lots presently held by class members. Specifically, the Commission proposes that (1) to limit competition in land sales between Amrep and class members, Amrep refrain from future sales of undeveloped lots until 50% of all lots at Rio Rancho have been developed with a dwelling; and that Amrep (2) list all lots available for resale with the Albuquerque multiple listing service; (3) be prohibited from charging advance listing fees for the resale of lots as broker and be limited to charging actual costs plus a 6% commission; and (4) be required to continue its policy of permitting land exchanges with an accompanying credit into more expensive, "upgrade" areas.

We decline to impose the first two proposed conditions. Although the risk of competition between Amrep and the class members is undesirable, it would be unfairly prejudicial to Amrep to bar a corporation whose future depends on the sale of land from engaging in such business for an indefinite, but surely a long, period. As to the second proposal, it appears that the benefits of listing undeveloped lots with the multiple listing service would not justify the cost of the service to Amrep. Counsel for Amrep has stated, without contradiction, that the use of the multiple listing service would be costly and ineffective in securing buyers for undifferentiated lots of vacant land. (Letter of Jacobs, Persinger & Parker, July 13, 1978, p. 1)

The Stipulation of Settlement in *Bryan and Husted* provides at paragraph 8 that Amrep "may charge normal brokerage commissions . . . followed by independent brokers in or around Albuquerque, New Mexico . . ." Counsel for Amrep represents that brokers in the Albuquerque area do not charge advance listing fees but that they receive commissions of 10%. We find no reason in the record why Amrep should not be permitted to follow local practice in this respect.

Amrep does not object to continuing its policy of permitting exchanges by lot holders into upgraded areas, but does contend that a requirement to continue the practice indefinitely would eliminate the corporation's "flexibility to adjust to changing circumstances." (Letter of Jacobs, Persinger & Parker, July 13, 1978, p. 3) However, counsel for both the plaintiffs and the FTC staff represent that the current resale market at Rio Rancho is dependent on the existence of the exchange privilege which attaches to the undeveloped lots. (Rosenfeld Affidavit, June 10, 1978, p. 20; Letter from the Los Angeles Regional Office of the Federal Trade Commission, June 22, 1978, p. 5) Accordingly, as a condition of approval, the Stipulation of Settlement should be amended to permit class members for a period of ten years following the entry of judgment to exchange into upgraded areas. The question remains as to what the amount of the exchange credit shall be. At present and for the last several years, that amount

has been $3,500. which appears to have represented the actual value of the undeveloped lots at the time that they were last valued. In view of the change of value which may have occurred since then and which, in an inflationary economy, will almost certainly occur during the ten years to come, the Stipulation of Settlement shall, as a condition of approval, contain a further amendment that the amount of credit shall be the greater of the value of the land as appraised in accordance with the procedure set forth in the next sentence or $3,500. The amendment shall provide that, at its expense, Amrep shall within sixty days of the entry of judgment and every two years thereafter cause five representative lots to be appraised, and the average of such appraised values shall constitute the appraised value referred to in the previous sentence.

*Expenditures for Recreational Improvements*

The FTC staff contends that the provision for recreational improvements in the Stipulation of Settlement in *Bryan and Husted* is unduly vague as to the location and type of improvement to be made. Moreover, it expresses the fear that Amrep, which owns a construction subsidiary, may simply assign the construction work to itself rather than hold competitive bidding on the project.

We are satisfied with the assurances of counsel for both plaintiffs and defendants that the nature and location of the improvements should rest in the discretion of Rio Rancho which alone has the familiarity with the development to determine what improvements are desirable and where (Rosenfeld Supplemental Affidavit, Letter of Jacobs, Persinger & Parker, June 9, 1978, p. 4) Moreover, by letter of June 9, 1978, counsel for Amrep has consented to deem the Stipulation in *Bryan and Husted* amended to provide that the work be done on the basis of competitive bidding. (Letter of Jacobs, Persinger & Parker, p. 4).

*Failure to Terminate Certain Contracts on Default*

The FTC staff also points out that certain class members have discontinued making installment payments. The staff fears that, under the terms of the settlement, these persons will have available to them only a credit against future payments rather than a cash refund. Counsel for Amrep states, however, that both sides have agreed that the class members in this category will receive a letter after the settlements become final offering them a choice between having their contracts terminated and receiving a cash refund or continuing the installment payments and receiving a credit. (Letter of Jacobs, Persinger & Parker, June 9, 1978, p. 5)

Accordingly, on condition that the amendments specified above are accepted, the settlements are approved. While the amount of the settlements is small in relation to the total recovery sought, we do not believe, given the weaknesses of the plaintiffs' cases, Amrep's presently precarious financial position, and the possibility that the class members may yet receive some future return on their investment, that the proposals are unfair. See *City of Detroit v. Grinnell, supra*, 495 F.2d at 455. Indeed, as a result of the combined scrutiny of plaintiffs' counsel, the FTC staff and the court, we believe that in all likelihood the settlements constitute the best relief available to plaintiffs.

## IV.

Counsel for the three plaintiff classes request awards of attorneys' fees in the amount of $250,000. in *Heit*, $350,000. in *Bryan and Husted*, and $75,000. in *Ross*.

Counsel acknowledge that the suggested amounts represent payment at rates far in excess of those which they charge for work done at an hourly rate, but rely on the accepted principle that an attorney is entitled to a larger fee when, as here, he has been retained on a contingent basis. *City of Detroit v. Grinnell, supra*, 495 F.2d 448; *Pergament v. Kaiser-Frazer Corp.*, 224 F.2d 80, 83 (6th Cir. 1955); *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 382 F.Supp. 999

(E.D.Pa.1974). They point out that courts have frequently granted awards in a range of 20 to 30% of the total amount secured for the class members. See, e. g., *Rosenfeld v. Black*, 56 F.R.D. 604, 605–606 (S.D.N.Y. 1972), and cases cited therein.

However, where, as here, the settlement is far from rich, it appears inappropriate that counsel be compensated at more than twice their normal hourly rate. Such a conclusion is not intended to minimize the effort or creative imagination expended by counsel, but merely to recognize that, unfortunately, the case at hand is one in which all concerned are doomed to be disappointed and that the disappointment must be shared among clients and attorneys. Accordingly, compensation for attorneys' services is awarded as follows: To counsel in *Heit* $187,500.; in *Ross* $37,500.; and in *Bryan and Husted* $300,000. Counsel in *Heit* and *Bryan and Husted* are also awarded out-of-pocket expenses in the amounts of $5,694.40 and $5,590.43 respectively. Expenses in *Ross* are to be deducted from the fee award. Counsel in *Bryan and Husted* are being compensated at a slightly higher rate than counsel in the other cases because of their particular efforts in the lawsuit and because they achieved substantial non-cash benefits for the members of their class. Approval of the settlement is granted on condition that the amounts by which the fee requests have been reduced will, in each instance, be used to increase the settlement sum to be awarded the class members.

The settlements are approved on the conditions specified above.

Counsel shall submit orders and judgments on notice accompanied by revised Stipulations of Settlement incorporating the amendments set out in this opinion and including amendments previously agreed to by counsel.