**Angelo TORNABENE, suing Individually and on behalf of a class of purchasers similarly situated, Plaintiff,**

v.

**GENERAL DEVELOPMENT CORP., GDC, Inc., City Investing Company, Louis Fischer and Herman Rosenbloom, Defendants.**

No. 78 C 1829.

United States District Court, E. D. New York.

Sept. 9, 1980.

Supplemental Memorandum Oct. 6, 1980.

---

Schoengold & Sporn, P. C. by Samuel P. Sporn, New York City, for plaintiff.

Sullivan & Cromwell by Edward W. Keane, and Robinson B. Lacy, New York City, for defendants.

## MEMORANDUM & ORDER

PLATT, District Judge.

This action was certified to proceed as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure by order dated March 28, 1980. The class was

defined to consist of those persons who purchased homesite lots located in Port Charlotte and North Port, Vero Beach Highlands and Vero Shores, Port St. Lucie, Port Malabar, Port LaBelle, Port St. John and Sebastian Highlands, Florida, from defendant General Development Corporation ("GDC") between January 1, 1974 and August 17, 1978, inclusive. A purchaser is not a member of the class if (i) the purchaser has cancelled the contract and received a full refund, or (ii) if GDC has cancelled the contract without retaining any moneys paid pursuant to the contract after the check presented for the downpayment was returned by the bank, or (iii) if the purchaser has executed or entered into a settlement, release, or accord and satisfaction with respect to all claims arising from the contract.

Before the matter reached trial, counsel for both parties indicated they had negotiated a settlement. Pursuant to Rule 23(e) such a compromise is not possible "without the approval of the court." Accordingly, the issue we now address is whether the proposed settlement merits court approval.

### FACTS

The complaint alleges, *inter alia*, that GDC violated the Interstate Land Sales Act, 15 U.S.C. §§ 1703, 1709, and the common law by employing a common scheme to defraud purchasers. The alleged purpose of the scheme was to induce prospective purchasers to purchase lots and/or to induce current owners to make additional purchases. The plaintiff asserts the misrepresentations made to him, and purportedly to the class, included:

(i) that purchased lots could be traded in (at cost plus appreciated value) and the same could be applied as a down payment on a house when the purchaser decided to build one;

(ii) that the lots represented salable, safe, and secure financial invest-

ments[1] which would appreciate rapidly and could be sold at substantial profit;

(iii) that there was a strong re-sale market if the purchaser decided to sell his lot or home;

(iv) that there was a strong rental market in the area with no problem securing tenants, if purchasers, after building a home, decided to rent it. (Complaint ¶ 12(a)).

Plaintiff urges that GDC knew, or should have known, that such representations were patently false.

The complaint further alleges that a provision in the purchase contracts provided that defaulting purchasers would forfeit all payments previously made, that GDC received substantial payments from defaulting purchasers, and that the forfeiture of all monies paid exceeded GDC's reasonable damages and constituted a penalty forbidden by law. (Complaint ¶ 14).

The scheme to defraud was implemented, according to plaintiff, by a high-pressure sales campaign. Moreover, purchasers of lots in 1975 failed to receive a printed property report as required by Section 1404(a)(1) of the Act, 15 U.S.C. § 1703(a)(1).

GDC vigorously denies all of the allegations and claims it is free from any wrongdoing whatsoever.

After the class was certified, counsel agreed to the terms of settlement we examine here. The major provisions of the proposed settlement include the following six programs to be completed within two years after the settlement becomes final:

1. *Community Amenities.* General* would spend not less than two million five hundred thousand dollars ($2,500,000) to establish new community amenities such as parks and land for other public uses, swimming pools, game areas, community centers, golf courses, club houses,

---

1. Counsel for plaintiff has not argued, and we therefore do not consider, whether sales of these lots constituted the sale of securities within the meaning of *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) and their progeny.

* General = "GDC"

and related improvements such as signs and lighting. The specific amenities to be established and the amounts expended with respect to particular facilities would be determined solely by General in accordance with its own best judgment, and General would not be required to establish all the different types of facilities referred to in the preceding sentence. However, General could not spend more than five hundred thousand dollars ($500,000) in satisfaction of its total obligation to establish community amenities under this program by dedicating (or donating) land for public uses. In addition, General would spend not less than two hundred fifty thousand dollars ($250,000) of the total amount for the development of community amenities in each of the following five Florida communities: Port Charlotte (including North Port), Vero Beach Highlands (including Vero Shores), Port Malabar, Port St. Lucie, and Port LaBelle.

2. *Road Maintenance.* General would spend at least five hundred thousand dollars ($500,000) on the repair and maintenance of roads.

3. *Multiple Lot Trade–Ins.* During a ninety–day period designated by General on thirty days advance notice to the class members, after the proposed settlement is approved, any class member who has not been excluded from the class would be entitled to participate, subject to applicable federal, state, and local laws and regulations, in a special program allowing him to trade in from one to four homesite lots on which his payments are current toward the purchase of a home built by General in its Florida communities. Under the special trade–in program, the principal payments and utility fees paid by the purchaser for the lot or lots to be traded in, exclusive of any discounts or credits, would be credited toward the purchase price of the home. In addition, on a trade–in of less than four lots, the purchaser would be entitled to an additional credit toward the purchase price of the home, as follows:

(a) In a trade–in of one lot, the purchaser would receive a credit equal to the full appreciation in value of the lot to be traded in. "Appreciation in value" means General's current selling price for a homesite lot similar to the homesite lot to be traded in, as of the first day of the month preceding the commencement of the ninety–day period, minus the price for which the class member purchased the lot to be traded in. For example, if a purchaser of a homesite lot purchased for $5,000 has paid $2,000 applicable to principal on the lot as of the trade–in date, and the selling price of a similar lot is $8,000 as of the first day of the month preceding the commencement of the ninety–day period, the homesite purchaser would receive a credit of $2,000 on account of the payments applicable to principal plus $3,000 on account of appreciation in value, for a total credit of $5,000 toward the purchase of any home built by General in its Florida communities.

(b) In a trade–in of two lots, the purchaser would receive a credit equal to seventy percent (70%) of the appreciation in value of one of the two lots to be traded in.

(c) In a trade–in of three lots, the purchaser would receive a credit equal to fifty percent (50%) of the appreciation in value of one of the lots to be traded in.

(d) In a trade–in of four lots, no credit would be allowed for any appreciation in value of any of the lots to be traded in.

There would be no limitation on the amount of the credit which could be applied toward the purchase of a home under any of the foregoing options, except that the credit on a trade–in of three or four lots could be applied only to a home with a minimum purchase price of fifty thousand dollars ($50,000). Moreover, the total allowed credits on all the lots traded in could exceed the current selling price of the lot on which the home is built. However, the current selling price of any single lot or one of the lots traded in

could not exceed the current selling price of the lot on which the home is constructed.

4. *Credits on New Homesite Purchases.* Subject to applicable federal, state, and local laws and regulations, each class member who has not been excluded from the class and whose homesite purchase contract was cancelled by General between January 1, 1974, and August 17, 1978, inclusive, for nonpayment of the required monthly installments, would be entitled to a credit toward the purchase of a new homesite lot. The credit would equal three hundred dollars ($300) plus the amount of any principal payments and utility fees paid pursuant to the cancelled contract which were retained by General upon cancellation of the contract, exclusive of any discounts or credits which were applicable to the cancelled contract. This credit could be applied against the purchase price of a homesite lot in any General community on condition that the purchaser makes minimum cash downpayment of ten percent (10%) of the purchase price of the lot. The amount of the ten percent downpayment would be calculated before giving effect to the credit under this program. If the purchaser makes the required minimum downpayment, the credit would be applicable against the balance due under the contract, but it would not reduce the required minimum downpayment. In addition, upon acceptance by General of a contract to purchase a homesite pursuant to this program, after payment of the minimum downpayment, the purchaser would be entitled to participate in his choice of one of the following two programs:

(a) *Six–Month Inspection Program.* The purchaser would be entitled to a guided tour provided by General of the community in which the purchased homesite lot is located during the six–month period following acceptance of his homesite purchase contract by General, provided that the purchaser is current in his payments pursuant to the contract. The purchaser might be unable to inspect the individual homesite lot purchased by him. At the time of the guided tour, General would pay the room charge on behalf of the purchaser for accommodations for two adults, double occupancy, at the community in which the purchased lot is located, for three days and two nights, subject to availability, provided that the accommodations are reserved at least thirty days in advance by completing a form supplied by General and sending the form to General together with a fifty dollar ($50.00) refundable deposit. A purchaser who takes the guided tour could cancel his homesite purchase contract, in which event he would receive a refund of all monies paid pursuant to the contract, not including any credits applicable to the contract.

(b) *Magic of Florida Program.* During the one–year period following acceptance of the homesite purchase contract by General, General would pay the room charge on behalf of the purchaser for accommodations for two adults, double occupancy, for four days and three nights at the community in which the purchased lot is located, subject to availability, and would furnish to the purchaser, free of charge, coupons redeemable for meals worth up to one hundred dollars ($100), provided that the accommodations are reserved at least thirty days in advance by completing a form supplied by General and sending the form to General together with a fifty dollar ($50.00) refundable deposit. In addition, all purchasers who choose to participate in the Magic of Florida Program would be entitled to participate in General's Home Building Credit Program as it is then in effect.

Both the Six Month Inspection Program and the Magic of Florida Program are existing programs offered by General to new homesite purchasers, and would be available to class members subject to the same terms and conditions as apply to new homesite purchasers as of the date

the class member enters into his new homesite purchase contract.

5. *Resale Listing Service.* General's subsidiary, Florida Home Finders, Inc., would offer to list for resale the deeded lot or lots of any class member who has not been excluded from the class. Such listing would be free of charge, but Florida Home Finders, Inc., would be entitled to charge its usual commission upon completion of any resulting resale transaction.

6. *Changes in Advertising Material.* General would make certain changes in its sales literature.

Rule 23(c)(2) of the Federal Rules of Civil Procedure requires notice in 23(b)(3) class actions. Pursuant to this mandate, notice of both class action certification and the proposed settlement of this litigation was mailed to members of the class on April 22, 1980. On that day some 44,547 notices were mailed.[2] The Post Office returned 475 of the notices due to incomplete addresses and 560 for insufficient postage. To correct these errors, another mailing of some 2,138 notices was undertaken on May 10, 1980. Approximately 3,440 of the notices mailed on the above dates were returned because the addressee was not at the given address.

After the Court was notified that members of the class had received "the best notice practicable under the circumstances," Fed.R.C.P. 23(c)(2), two hearings were held. Class members were invited to attend and voice either their approval or disapproval of the proposed settlement.

The first hearing was held June 13, 1980 and more than one hundred persons attended. In accordance with the notice to the class, only those individuals who sent a written statement of their intent to object to the proposed settlement were allowed to address the Court at the hearing. Ralph G. Rieser, Elizabeth Huang DeLieu, Alphonsus Chou, Anthony Pagano, Leonard Pagano, and Lorraine and George Lagarde filed Notices of Objection[3] and Messrs. Chou and Rieser made oral presentations. Counsel for plaintiffs and defendant spoke in favor of the proposed settlement.

An attorney from the Federal Trade Commission's Bureau of Consumer Protection made an informal appearance and opposed the settlement for a variety of reasons.[4]

The Court determined that a further hearing was required. After explaining procedures for evaluating the proposed settlement and the legal effect of "opting out" of the class by requesting exclusion from the Tornabene action, the Court adjourned the hearing until July 11 and, on consent of counsel for both sides, extended to certain class members the deadline for opting out until that date.

Supplementary papers in support of the proposed settlement were filed by counsel for both sides and Mr. Rieser submitted additional papers opposing the settlement. At the second hearing, on July 11, less than fifty persons were present. Counsel for both sides spoke in favor of the settlement and Mr. Rieser spoke in opposition. The FTC made no appearance. Upon request of the Court, defendant again consented to an extension of the opt-out deadline for those members attending the July hearing to 5 p.m. on July 14, 1980.

At final count, a total of 2,179 requests for exclusion from the class were received, 80 of which would not have been timely but for the two extensions of time to request exclusion.

---

2. This number represents the number of lots purchased in the class period. As some purchasers contracted for more than one lot, the number of class members is less than the total number of notices mailed. There appear to be approximately 36,000 class members.

3. Mr. Bruce Rossner and Mr. Winston A. Henry appended to Mr. Rieser's objecting papers their thoughts on the proposed settlement and arguably could be classed as objectors as well.

4. In his comments he specified that they "represent the view of the Bureau and do not necessarily reflect the views of the Commission or any individual Commissioner."

**I**

At the outset, it should be noted that this Court had serious doubts and reservations about the settlement as originally proposed and although it is approving the settlement as amended, has some doubts about certain points thereof as indicated below and the sufficiency thereof. Of the six programs outlined in the Notice to the class, those who were opposed suggested and we originally perceived, *inter alia*, the following shortcomings:

(1) *Community Amenities.* While GDC promised in the original proposal to spend $2,500,000 on community amenities, the notice sent to the class specified that the amenities to be established and the amounts to be spent on particular facilities "would be determined solely by [GDC] in accordance with its own best judgment." The only limitation on GDC's discretion in establishing these amenities was that it would satisfy the $2.5 million amount by donating only $500,000 worth of land for public uses.

One of the most serious objections to the initial proposal involved the method of valuation of this $2,500,000 in expenditures. Who was to determine what constituted $500,000 of land, and by what method? The amount of land GDC originally purchased for $500,000 and the amount of land that constituted $500,000 worth of ¼ acre homesite lots represent significantly different quantities of real estate.

Moreover, the Notice of Proposed Settlement contained no provision for determining who was to do the construction work on the remaining amenities and how such work was to be valued. It was at least a possibility that GDC might contract out the amenities construction to subsidiary or affiliated companies. Nothing in the original proposed settlement precluded this possibility for abuse.

(2) *Road Maintenance.* The proposed settlement's $500,000 for road maintenance suffered from the valuation problems set out above in addition to the fact that it represented a small amount in relation to the size of the developments.

(3) *Multiple Lot Trade–Ins.* At first blush, the multiple lot trade–in program appeared to constitute the heart of the settlement. However, on closer inspection it was and it is not clear whether the class or GDC will benefit more from this program. For example, in a trade–in of three lots towards the purchase of a home built by GDC, one would receive only 50% of the appreciation in value of one of the lots to be traded in. In a four–lot trade–in, no credit would be allowed for any appreciation in value of any of the lots to be traded in. In addition, in a three or four lot trade–in, credit can only be applied to a home with a minimum purchase price of $50,000. In essence, GDC is arguably offering land trade–ins only to produce for itself sales in housing. Moreover for at least some trade–ins GDC seizes the full benefit of appreciation in value since date of purchase, despite the fact that the purchaser had previously obligated himself to buy the lots, and therefor assumed the concomitant risks that obligation entailed.

(4) *Credits on New Homesite Purchases for Defaulting Purchasers.* Those members of the class whose contracts were cancelled between January 1, 1974 and August 17, 1978 inclusive, for default in making payments, will be offered by GDC a credit equal to the purchaser's equity retained by GDC plus $300. The purchaser must make a downpayment toward the lot, in the amount of 10% of the purchase price. This program at least offers those class members who felt victimized by the alleged fraudulent scheme to recapture the equity they forfeited, plus the $300 bonus. However, for GDC to pay out the $300 bonus, the class members will have to pay GDC a 10% downpayment, GDC thus regains not only a number of purchasers but a sizable cash contribution as well. The Six Month Inspection Program and the Magic of Florida Program are existing GDC programs and offer nothing new to the class members.

(5) *Resale Listing Service.* This service is also of questionable value to the class. Other than "listing" there is no promotional service outlined in the proposed settlement, nor is there any limit on GDC's continuing

sales activity. Thus, those seeking to sell will be in direct competition with GDC. GDC will also make money on this program, as its subsidiary, Florida Home–Finders, Inc., will charge its usual commission on any sales.

(6) *Advertising Modifications.* Finally, while the original proposed settlement indicated changes in sales literature will be made, there was absolutely no indication of any kind what those changes, in fact, would be. Thus, this "program" was so vague as to be virtually meaningless to the class.

## II

This Court is well aware of the admonition by Circuit Court Judge James L. Oakes regarding the "possible abuse of class actions by lawyers." [5] Indeed, the issues we address here may be similar to the ones that prompted Circuit Judge Ellsworth A. Van Graafeiland to recognize the denomination of class actions as "lawyer's lawsuits." [6]

Consider for a moment the possibilities for abuse in a case such as this.[7] Strong incentives may exist for defendants to settle when they face the massive potential liabilities in a class action where the class consists of some 36,000 members. Strong temptation to settle might also exist if plaintiffs' counsel obtains substantial fees as part of the settlement package.[8] One observer has noted:

> "An attorney may be willing to settle a class action, without due regard for the best interests of class members in order to avoid the risk of defeat at trial. This potential conflict is exacerbated by a wide gap between the size of fee awards

and the judgments won for individual class members: no class member may have a sufficient interest in the course of litigation to impose any check on the strongly interested attorney's dealings." 89 Harv.L.Rev. 1318, 1605 (1976).

Thus, defendants desire to settle coupled with the temptation of plaintiff's counsel to avoid the risk of trial can lead to a conflict of interest that breeds unethical collusion between attorneys and leaves the interests of the class unprotected. If such is the case, the class may become virtually unrepresented.[9]

## III

Some steps have been taken to improve the original proposal and to make the settlement more reasonable. Counsel for GDC, at the second hearing held July 11, clarified some of the ambiguities in the proposed settlement. First, GDC agreed that all contract work required by the settlement would be done by firms totally independent of GDC and that such firms would be selected by competitive bidding. Second, GDC agreed that an independent appraiser would be utilized to determine the values of the land attributed to public use on the basis of fair market value and to insure the fairness of the appraisal. Third, GDC specified precisely what additional community amenities would be constructed in satisfaction of Program 1 of the proposed settlement.[10] Fourth and finally, GDC consented to an extension of time, for those class members who reside outside the United States and Canada and all class members whose addresses as shown in the receivables file of GDC contain more than four lines

---

5. 2 W.N.Eng.L.Rev. 169, 175 (1979).

6. *Van Gemert v. Boeing Co.*, 573 F.2d 733, 735 (2d Cir. 1978).

7. We do not mean to imply we believe such abuse, in fact, occurred in this case.

8. In this case, plaintiff's attorneys seek $345,-000 in fees.

9. Moreover, as the quoted passage above points out, no class member may have a sufficiently sizable interest to protect against this development. As an *example only*, consider

the case at bar. If the settlement were approved, GDC would face out–of–pocket expenses (other than attorney's fees) of $3,000,-000–$2,500,000 for constructing self–selected amenities and $500,000 for road repair and maintenance. (The remaining four programs may well become profit–makers for GDC). If the class is taken to consist of 36,000 members, then each class member received only $83.13 worth of "settlement." In contrast, attorneys for the class have $345,000 at stake.

10. See the Appendix for these specifics.

(who thus received the second mailing of the Notice) to opt out of this action to June 13, 1980 and extended the time to seek exclusion for those class members who attended the July hearing to July 14, 1980.

## IV

 In this Circuit, when considering whether to approve a class action proposed settlement, "the most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974). Of course, this kind of balancing is not an exact science and it is recognized that "the evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice." *Id.*, 468. Judge Lasker has ruled that "as the product of lengthy bargaining between lawyers well acquainted with the applicable law and facts, the settlements are presumed to be fair and reasonable." *Heit v. Amrep Corp.*, 82 F.R.D. 130 (S.D.N.Y.1979).[11]

We are not convinced that that presumption was originally warranted in this case. However, GDC's clarifications at the July 11 hearing (independent contractors, competitive bidding, fair market value land values substantiated by independent appraisers, specification of the community amenities to be developed, and the extended opt-out dates) have helped to persuade this Court that the settlement should be approved.

Plaintiffs have substantial obstacles in the proof of their case. To prevail, the class would have to show that the defendants utilized the same common scheme to defraud purchasers–a burdensome task considering the fact that some 44,000 lots were purchased. The allegations in the case at bar are very similar to those in *Heit v. Amrep, supra*, including high pressure sales techniques and violations of the Interstate Land Sales Full Disclosure Act. In that case Judge Lasker gave great weight to both the general policy favoring settlement and counsels' representations that the proposed settlement there represented the "best available compromise." *Id.* at 132. Moreover, Judge Lasker approved that settlement despite the strong opposition of "the many class members who appeared at the hearings." *Id.* Only six members of the class objected to the proposed settlement in the case at bar, and since objecting some of them have opted for exclusion from the class.[12]

Perhaps the strongest factor supporting approval here is the extended period given to request exclusion and the relatively large number (2,179) who in fact did so. The Court is convinced that both those class members who seek the fruits of the settlement and those who prefer to pursue other remedies should be allowed the choice. It is not the Court's role to substitute its business judgment for that of the class or that of counsel.[13] By approving this settlement the majority who never objected and the very significant number who opted–out are satisfied; fewer than six objectors are still members of the class.

 Therefore, due to (i) the general policy favoring settlements; (ii) the majority of class members who apparently favor this settlement; (iii) the arms–length bargaining that produced this settlement and the unanimous agreement of counsel for both sides that this represents the best possible compromise; (iv) the heavy burdens of proof plaintiffs face to win their case; and

11. This rule is not universally accepted. Indeed, the majority rule may be that "the burden is upon the proponents of a settlement to persuade the court that it is fair, adequate, and reasonable." 3B Moore's Fed.Practice, ¶ 23.-80[4].

12. It should be noted that, in addition to the six formal objectors, plaintiffs' counsel received 254 letters of inquiry from the class and 47 letters from attorneys representing members of the class. Plaintiffs' counsel contends only 13 of the letters expressed dissatisfaction with the settlement.

13. *Pearson v. Ecological Science Corp.*, 522 F.2d 171 (5th Cir. 1975), *cert. denied sub nom. Skydell v. Ecological Science Corp.*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976).

(v) the extended opt–out date which protected those class members who did not wish to be bound by this settlement's terms, the proposed settlement must be, and hereby is, approved.

## V

Finally, we consider the request by counsel for the class for attorneys fees. We note that once it is determined that attorney's fees are to be awarded, the amount to be awarded is within the discretion of the court. *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir. 1975), *cert. denied*, 423 U.S. 844, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); 3B Moore's Federal Practice ¶ 23.91 at 23–566. We have no doubt that attorney's fees are proper here; the only issue is the appropriate amount to award. In *Lindy Bros. Bldrs., Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (2d Cir. 1973), the court noted that one criterion to be considered was the quality of an attorney's work and one factor to weigh in evaluating that work was "the amount of the recovery obtained." *Id.* at 168.

The recovery obtained for the class here is *relatively* small. The only out–of–pocket costs GDC faces in this settlement,[14] (the $3,000,000 for "community amenities" and "road maintenance,") enhance the value of GDC's Florida properties and thereby make them more attractive to future purchasers. The remaining programs in the settlement package may well earn money for GDC. Moreover, the community amenities and road maintenance elements only indirectly benefit the class. Class members whose lots are somewhat removed from the proposed amenities may find their properties improved negligibly, if at all. The settlement may therefore benefit GDC more than the class that seeks recovery against it. In short, the results achieved do not warrant approval of the fees sought by the plaintiff. See *Selzer v. Fleisher*, 629 F.2d 809, 814 (2d Cir. 1980).

For these reasons, and for those enumerated by this Circuit in *Alpine Pharmacy, Inc. v. Chas. Pfizer and Co., Inc.*, 481 F.2d 1045, at 1050 (2d Cir. 1973),[15] we approve attorney's fees for plaintiffs' attorneys of $93,000 plus costs and disbursements of $32,354, for a total of $125,354. The balance of $219,646, representing the difference between such award and the amount the defendants agreed to pay ($345,000), should (as a condition of this approval) be used, by GDC, as additional sums in the road maintenance program mentioned above.

SO ORDERED.

## APPENDIX

### PROPOSED AMENITIES

*PORT CHARLOTTE (including North Port)*:

1. General Development intends to improve the North Port Country Club by providing a pool, restaurant, patio deck. It is estimated that this improvement will cost $165,000.00.

2. General Development will contribute $240,000.00 to the City of North Port for a City Park.

*PORT ST. LUCIE*:

1. In North Port St. Lucie near the old marina site, we intend to construct an amenity which will contain a pool and 15 shuffleboard courts. It is anticipated that this facility will cost $150,000.

2. Four racquet ball courts/handball courts will be constructed at the Sandpiper Bay resort. The estimated cost is approximately $50,000.00.

3. General intends to offer $50,000 in community amenities to the City of Port St. Lucie for construction of recreational facilities which will benefit all City residents. The specific amenities and their location to be mutually approved by the City and General.

---

14. Other than attorney's fees.

15. *See also State of Illinois v. Harper & Row Publishers, Inc.*, 55 F.R.D. 221 at 224 (N.D.Ill. 1972).

APPENDIX—Continued

*PORT MALABAR:*

1. General Development intends to spend approximately $100,000.00 to repair, refurbish and improve and add additional facilities to the Port Malabar Country Club.

2. General Development intends to spend $100,000.00 in general landscaping, treeplanting, streetscaping and beautification of the overall Port Malabar community.

3. General Development intends to donate to the City of Palm Bay Regional Park Facility $50,000.00 for construction of improvements to or maintenance of the existing recreational facilities which will benefit all City residents and residents of Port Malabar.

*PORT LaBELLE:*

In Port LaBelle, we intend to complete a motel which will contain approximately 50 rooms, a restaurant, swimming pool and tennis courts. The estimated cost of this facility will be $2,000,000.00, and will be integrated into the existing Port LaBelle Country Club and golf course amenities.

*VERO BEACH HIGHLANDS:*

1. Over the next two years we intend to construct a facility which will include a pool, recreation building, two tennis courts, two shuffleboard courts, and a basketball court. It is anticipated that this facility will cost approximately $400,000.00.

In establishing the cost of these facilities, General Development utilizes subcontractors in constructing the facilities. The process of letting the contracts is as follows. Our Company employs in–house estimators to establish a reasonable cost of the facility. These estimators are experienced in Florida construction. They utilize comparative costs of other facilities constructed. They are familiar with cost of materials and hourly labor cost to complete a project. The project is then sent out for bids to subcontractors in the area in which the facility will lie. Bids are made and accepted on a competitive basis. General Development will award a subcontract to the lowest qualified bidder. The qualities sought from a subcontractor are that he has the financial capability to complete the project, that he has adequate insurance, and that he has the proficiency to complete that type of project. This proficiency is generally demonstrated by providing General Development with his license or a certificate of competency issued by an appropriate governmental authority. None of the subcontractors engaged have any affiliation with General Development. General Development does not own any stock or control any of these subcontractors. General Development's role in the construction of these facilities is one of a general contractor. A general contractor is responsible for coordination, scheduling and inspection of the work done by the subcontractors.

## SUPPLEMENTAL MEMORANDUM

Plaintiff's counsel, Samuel P. Sporn, Esq., moves "for reconsideration of the Court's determination that the amount of $93,000. as and for plaintiff's attorneys' fees is fair and reasonable" on the ground that the Court did not articulate its reasons for disallowing plaintiff's request for fees and expenses aggregating $345,000. Actually, as is indicated in our Memorandum and Order dated September 9, 1980, the Court allowed an aggregate amount of $125,354. for plaintiff's attorneys' fees and expenses and we did indicate our reasons therefor.

Specifically, plaintiff's counsel complains that this Court did not make any determination with respect to the eight "parameters" which the Second Circuit said "must be considered by a court in evaluating a fee request" in *City of Detroit v. Grinnell*, 495 F.2d 448 (2d Cir. 1974). This Court, however, did consider each of those "parameters", *inter alia*, in arriving at its decision. The Court recognized that plaintiff's counsel did not have the benefit of a prior judgment or decree in a case brought by the Government; the Court recognized that the standing of counsel at the bar was of the highest caliber; the Court recognized the magnitude and the complexity of the litigation and the responsibility undertaken and had full knowledge of the conferences, the arguments and the work that was done, and

the Court fully considered the attorney's risk in the litigation. Nonetheless, as the Court stated in its Memorandum and Order dated September 9, 1980, "The recovery obtained for the class here is *relatively* small. The actual benefits to the members of the class from the $3,000,000. which the defendants have agreed to expend in the improvement of their properties are intangible and, for the most part, speculative.

■ If this whole question is viewed from a different perspective, perhaps this Court's decision may be understood. If plaintiff had gone to trial and defendants had prevailed, plaintiff's attorneys would have received nothing for their efforts. On the other hand, if plaintiff had gone to trial and proved liability but were only able to prove nominal damages, plaintiff's counsel would have been awarded at most a very modest fee. In this case, plaintiff and his counsel achieved a settlement which, at best, might be said to provide only indirect and speculative benefits to the members of the class and they were awarded all of their expenses and a *relatively* substantial fee.

In response to particular statements by plaintiff's counsel on this motion, this Court does not believe that there was "unethical collusion between attorneys" or that plaintiff's counsel "sold this case short." This Court feels that plaintiff's counsel may well have done all that he could for the class, given the facts and circumstances available to him. In short and stated in yet another way, plaintiff and members of the class apparently did not have a very good case. In any contingency case where the plaintiff and his counsel do not have a very good case, plaintiff's counsel may at the conclusion of the case, whether by settlement or otherwise, find that he has been awarded a smaller fee than might otherwise be expected for the extensive efforts expended. This case is no different.

For the foregoing reasons, plaintiff's counsel's motion for reconsideration must be, and hereby is, denied.

SO ORDERED.